Judgment for the Commonwealth.

---

*Philadelphia,
Monday,
April 4.*

The Commonwealth *against* WOLBERT and others.

*An omission on the part of the accounting officers of the Commonwealth, for a year and upwards,* THIS was a *scire facias* upon a judgment obtained on the official bond of *Frederick Wolbert*, late prothonotary of the Court of Common Pleas of the city and county of to compel the prothonotary of the Common Pleas to settle his account of fees, does not discharge the sureties in the official bond of the prothonotary; although the officers are authorized to compel an account at the end of each year, and to enforce payment by execution. *Quære,* what would have been the law if the officers had been requested to proceed by the sureties.

The bond of the prothonotary, though not required by any law, is binding upon him and his sureties as a voluntary bond; and being in the first place for the use of the Commonwealth, a payment under it to an individual creditor of the prothonotary, is at the surety's peril. The Commonwealth must be first satisfied to the amount of the whole penalty.

*Philadelphia*, for money due to the Commonwealth on account of a tax on the fees of his office.

At a *Nisi Prius* in *March* last, the cause was tried before the Chief Justice, when by consent a verdict was entered for the Commonwealth for 953 dollars 28 cents, subject to the Court's opinion on the facts in evidence, whether the Commonwealth was entitled to recover at all, and if at all, how much.

Those facts, and the arguments of counsel, are fully stated in the opinions of the judges.

*Wallace* and *Ingersoll* argued for the Commonwealth.

*Browne* and *Binney* for the sureties.

TILGHMAN C. J. *Frederick Wolbert* was appointed prothonotary on the 30th *January* 1809. His bond is dated the 2d *February* 1809, and he was removed from office the 25th *April* 1811. It is the duty of the several prothonotaries to render an annual account of the fees received by them, to the accounting officers of the Commonwealth; and those officers are authorized to compel the rendering of an account, and the payment of the balance.* On the 14th of *March* 1811, *F. Wolbert* rendered an account of fees received from 26th *February* 1810, to the 1st of *October* of the same year. At the same time he wrote a letter to the auditor general, apologizing for not having rendered an account for his *first year*, ending 26th *February* 1810, and praying a short indulgence. This letter was sent by *W. Binder* one of *F. Wolbert*'s securities, together with a sum of money to the amount of the balance due on the account rendered. As soon as this account was settled by the accounting officers, *Wolbert* was removed from office. An action was commenced on his official bond to the next term of the Supreme Court, which was tried 22d *June* 1812, and the sum of 896 dollars 70 cents, found to be due to the Commonwealth. Judgment was entered for the Commonwealth for the penalty of the bond at *December* term 1812. On this judgment the present *sci. fa.* was brought to *March* 1813, for the recovery of the balance due on another account of

1814.

COMMON-
WEALTH
*v.*
WOLBERT
et al.

---

* *Acts 4th Oct.* 1788. 2 *St. Laws* 631., *4th Apr.* 1792. 4 *Car. and Bio.* 148., *5th Dec.* 1801. 6 *Car. and Bio.* 208., *24th Feb.* 1806. 4 *Smith's L.* 278.

*F. Wolbert*, for fees received from 1st *October* 1810 to 22d *April* 1811.

It is contended in the first place by the counsel for the sureties, that they are discharged by the laches of the accounting officers, in not calling on *Wolbert* to render his account immediately, on the expiration of the first year. They lay it down as a principle, that where the obligee agrees to do a thing, which would lessen the responsibility of the sureties, and omits to do it, they are discharged. Such is the case of *Montague* v. *Titcombe*, 2 *Vern.* 518., where one being bound as surety for the good conduct of his son, who was an apprentice to a merchant, and the master undertaking to see the cash account settled monthly, it was held that the surety was discharged from his responsibility for embezzlements of cash by the apprentice, after the first month, because the master had failed in his engagements to see the cash account settled. This was very reasonable, because if the master had performed his part of the contract, it is probable, that the evil practices of the apprentice would have been prevented. But although the Commonwealth for its own benefit has authorized the accounting officers to compel a settlement and payment, yet *it never* engaged to the sureties, that this should be done at any particular time. If indeed the sureties had requested those officers to proceed, and they had refused or neglected to do so, the case would have borne a very different aspect; but until such a case arises I shall give no opinion on it. The case of *The People* v. *Jansen and others* was also cited from 7 *Johns. N. Y. Rep.* 332. There the sureties of a loan officer were held to be discharged, through the negligence of the public officers, whose duty it was by the law under which the bond was taken, to examine the loan officer's accounts annually, and remove him in case of default. The negligence in that case was very extraordinary indeed. The loan officer's accounts were not examined for several years, and he was suffered to remain in office ten or twelve years after making default. Meanwhile the surety died, without having received notice of the default. Add to this, that after a suit had been brought against the principal, while in good circumstances, indulgence was given until he became insolvent. But how different was that case from the present. *Frederick*

*Wolbert* was removed from office, as soon as it was ascertained that he had not completely accounted for all fees received up to the time of the rendering of his account, which was but a little more than two years from his appointment; and there is great reason to suppose, that his sureties were acquainted with the state of his accounts, because *Binder* was the bearer of the letter of the 14th of *March* 1811, in which indulgence was asked on the account for the *first year.* It is always in the power of the sureties to know whether an account has been rendered; and they cannot be said to act with reasonable prudence, if they do not make this enquiry. There is no occasion to say at present, whether any and what degree of indulgence to the principal, will discharge the surety, because I am decidedly of opinion, that there is no pretence for a discharge from any indulgence given in this case.

It was once decided by the Court of Common Pleas for Northumberland county, that the bare omission to bring an action on a bond for a private debt, after it was due, was a discharge of the surety. But that decision was reversed by this Court without hesitation, because there is no principle of law or equity, which calls upon the obligee to proceed with such rigour against the principal, on peril of losing his security.

It has been determined in *England,* that where the creditor, without consulting the surety, enlarges the time of payment, so as to put it out of his power to proceed against the principal if required so to do by the surety, this shall operate as a discharge, because the debt is put upon a different footing from that on which it originally stood, and from that on which the surety had a right to expect it would remain. But it is against all equity and reason to say, that the security is discharged by the mere omission to bring suit, which makes not the least alteration in any part of the agreement express or implied. Nor do I understand that any such principle is contended for in the case of a private debt; for certainly it would introduce a scene of distress, not called for by public convenience or expediency, or required by the fair construction of the contract.

A distinction is taken between a private debt, and one due from a public officer, who by law may be compelled to

account. But granting that such distinction is not without foundation, yet it would require much stronger circumstances than this case presents, to operate as a discharge. It would be essential, that the indulgence should be without the approbation of the surety, which I do not take to be the case here, and that alone is decisive. I say, I do not take it to be the case, because when I see *Binder* carrying the money due on the account rendered, and the letter by which *Wolbert* prayed indulgence on the account, embracing the first period after his appointment, I cannot but conclude, that he (*Binder*) so far from thinking himself discharged, joined with *Wolbert* in the petition for further indulgence.

Another question is made in this case. Supposing the Commonwealth entitled to a recovery, to what amount shall it be. The defendants claim credit for a payment made to *Joseph Parham*, who brought suit on the same bond 22d *May* 1812. The suit was submitted to arbitration, and the arbitrators made an award in favour of the plaintiff for 456 dollars 70 cents, which was filed 2d *July* 1812, and of course by virtue of our act of assembly had the effect of a judgment on that day, so that *Parham's* suit was instituted after that of the Commonwealth, but his judgment was prior.

We are to consider then, what is the nature of the official bond of the prothonotary, and for whose benefit was it given. After a careful examination, it appears that there was no act of assembly requiring such bond. Before the adoption of the present constitution, it was not the custom for the prothonotaries to give bonds; but since, the governor has required them of his own motion. Supposing them then to be voluntary on the part of the obligors, yet being given for a useful purpose, they are valid in law. But for whose use are they? The bond in this case is given to the Commonwealth for the use *thereof*. These are the expressions, and taken literally, they indicate a use for the Commonwealth *only*. But perhaps the use may be extended to private persons, who may be injured by the official misbehaviour of the prothonotary, because the condition extends to all the duties of his office. We have an old act of assembly made in the year 1713, by the 14th *section* of which (1 *Smith's Laws* 85) it is enacted, that all bonds given by direction of

1814.

COMMON-
WEALTH
v.
WOLBERT
et al.

any law, by persons in office, for the due execution of their respective offices, shall be for the use of, and in trust for the *persons concerned*, and the mode of proceeding on such bonds is pointed out. But this act does not comprehend the bond in question, because it is not given by direction of any law. If private persons have any interest in it then, it must be, because from its nature, it appears to be in trust for them. It is unnecessary however to decide that point, if the Commonwealth has, as I am clearly of opinion it has, a preference for its whole claim, against all private persons, not only because the bond is expressed to be for its use, but because the first suit was commenced for the Commonwealth; and the defendants shall not avail themselves of their negligence or collusion with *Parham*, in suffering him to obtain judgment in his action. It was the duty of the defendants to plead before the arbitrators, that a prior action had been brought for the use of the Commonwealth, and was then depending, and if the arbitrators had overruled this plea, an appeal should have been entered. So that if the defendants suffer by *Parham's* judgment, they have nobody to blame but themselves.

Upon the whole, it appears that the Commonwealth obtained judgment against the defendants for the penalty of the bond, and that there is no act of assembly, by which any private person is let in. Neither is there any principle of common law, or of equity, by which the Commonwealth will be deprived of the benefit of this judgment to its full extent, as long as it has a just demand unsatisfied, arising out of a breach of the bond. But it has been proved, that there is a just demand unsatisfied for fees received by *Frederick Wolbert*, to the full amount of the penalty of the bond, and something more. I am therefore of opinion, that the Commonwealth should recover all that part of the penalty, which remains after deducting the amount recovered in the first action.

YEATES J. The facts of this case have been fully detailed by the Chief Justice. The counsel on both sides agree that no act of assembly can be found, directing that the prothonotaries of the Courts of Common Pleas, should give bonds with sureties for the faithful performance of their duties.

Hence it has been asserted by one of the defendants' counsel, that the bond given in this case not being authorized by law, is not binding against the surviving party.

It is evident in the present instance, that the taking of such a bond was a prudent and necessary precaution to guard the public interest, and on these terms Mr. *Wolbert* was commissioned. It is therefore valid at common law as a voluntary obligation, and falls within the principle laid down in *Johnson* v. *Lasene*, 2 *Ld. Raym.* 1459, 2 *Stra.* 745, wherein it was held, that though an executor is not obliged to give bail in error, yet the Court may well take it; and if he will voluntarily enter into such a recognizance, it shall bind him. But the question cannot come into consideration in the present suit, judgment having been rendered on the verdict obtained on the official bond, which thereby *transit in rem judicatam.* The merits of that judgment while it remains unreversed, cannot be overhawled.

The official bond was given to the Commonwealth in the penalty of 4266 dollars, 66 cents, for the use of the Commonwealth, conditioned for the faithful performance of the duties of *Wolbert*, as prothonotary. Judging from these expressions, we are bound to presume, that the immediate object of the bond was the security of the monies which might fall due to the state, and I deem it unnecessary from the facts in this case, to decide how far suitors in court were protected thereby.

The attorney general instituted an action on this bond returnable to *December* term 1811, on which a trial was had at *Nisi Prius*, upon the plea of payment, on the 22d *June* 1812, and a verdict found for the penalty of the bond, and the jury further certified that 896 dollars 87 cents, were then due to the Commonwealth. In *December* term following, judgment was rendered on this verdict. A second settlement was made by *Wolbert* to the accounting officers of the state, and on the 19th *October* 1811, a sum of 842 dollars 14½ cents, was found due to the Commonwealth, of which *Wolbert* had received due notice. The attorney general afterwards moved, that he should be permitted to take out execution for this sum under the judgment which he had obtained; but it appearing to the Court that other creditors claimed under the

judgment, the Court directed that a *scire facias* should issue in order that all the facts might come regularly before a jury on trial. An amicable *scire facias* was therefore filed by mutual consent, returnable to *March* term 1813. Previously thereto, *Robert Wallace* and ——— *Maloney* issued their writs of *scire facias* returnable to the same term, for two sums of money paid into the hands of the prothonotary, by order of the Court of Common Pleas. Upon the trial of the present cause, the defendant gave in evidence the payment of four sums of money, besides the sums certified by the former verdict for the use of the state, amounting in the whole to 3329 dolls. 65$\frac{1}{2}$ cts. leaving a balance of the penalty 937 dolls. and a half cent. Besides which it was shewn, that *Joseph Parham* brought on the 22d *May* 1812, a suit on the same official bond, to *July* term following, which proceeded to arbitration, and that the report thereon was filed on the 2d *July* 1812, (before the return of the process) finding for the plaintiff 456 dollars 70 cents, upon which judgment was entered on the same day, in pursuance whereof, 509 dollars 8 cents was paid by the surety to the plaintiff, including the costs, on the 12th *November* 1812. On the whole facts disclosed, it was submitted to the Court in bank to decide, whether the Commonwealth was entitled to recover any thing, and how much in this suit.

The surviving surety has contended, that he is discharged from all responsibility by the negligent conduct of the officers of the Commonwealth, and that in all events he is entitled to credit for the sum paid to *Parham*. The private creditors have insisted that if they should not be deemed entitled to preference as to the remaining balance of the penalty, they are at least entitled to come in *pro rata*.

Upon the first objection it has been urged, that the executive magistrate should have removed *Wolbert* from office immediately on his first failure to settle his annual account in the treasury, according to the provisions of the act of assembly, 24th *February* 1806; that the existing law gave full power to the accounting officers to oblige him to settle his accounts; and that the case before the court must be considered in the same light, as if all these laws had been incorporated in the condition of the obligation. Here has, it is said, been a gross omission and neglect, by proceeding in

1814.

COMMON-
WEALTH
*v.*
WOLBERT
et al.

the first instance for the debt incurred during the last year of his office; and where an obligor gives time for payment to his principal debtor, his sureties are discharged in equity. The case was compared to *The People* v. *Jansen and others,* 7 *Johns.* 332, wherein it was adjudged that sureties in an official bond may urge laches, in not proceeding against the principal according to the provisions of the law, by way of defence. I answer, that the case in *Johnson* was one of the most gross neglect for ten years, during which the surety was kept in entire ignorance; and the act itself imperiously directed the officer's removal. The delay here did not exceed twelve months, and the law required no removal. Mr. *Binder* also managed all the business of *Wolbert* with the treasury, and must have known all the transactions. He must be presumed to have concurred in asking indulgence from the accounting officers. The rule in equity in the *English* cases, is admitted as to indulgence given to the principal debtor; but I do not know that we have extended these cases in their full latitude. A bill will lie in chancery by a surety to compel a creditor to sue his principal; and equity will act on his refusal or neglect to sue, particularly where the condition of the surety is thereby deteriorated. The surety here has no such remedy, he must pay the money on the bond, and take an assignment. Should he demand a suit against the principal in desperate circumstances, I should hold him bound to tender an indemnification. That a surety is not discharged by the obligee of a bond not proceeding against the principal, when the same becomes due, is I believe generally understood in this state. It was so decided some years ago in *Delaff* v. *Turbett's Ex'rs.* at a Circuit Court in *Lancaster,* and not long since in the middle district by the whole Court in bank, in the case of *Simpson and others,* upon full argument on a writ of error. In this instance it was stated that the debtor was solvent, when the debt became payable. I would not however be understood to say that in no given case the surety in a bond under all circumstances would be responsible.

Besides, an insuperable difficulty lies in the defendants' way, on this branch of the argument. The cause was tried under the plea of payment, and no notice of this special matter was given, agreeably to the rule of this court. It

cannot be pretended, that the conduct of the officers of government could be available at common law under this plea. It would operate as a complete surprize on the attorney general. Who can tell what he might bring forward if this defence was disclosed in due time? He might shew that the most vigilant attention was paid by the accounting officers, in the discharge of their duties in this instance, and that the delay and indulgence granted were justified by existing circumstances, and even sought for by the very sureties who now set it up as a ground of defence. In this point of view the ground taken would not discharge the surety from responsibility.

1814.

COMMON-
WEALTH
v.
WOLBERT
et al.

I consider the payment under *Parham's* judgment as voluntary and not compulsory. The proceedings were wholly illegal. Two suits of the same nature cannot be maintained on the same bond. The defendants knew they had been sued in the first action to *December* term 1811, and were bound to plead the former suit still depending, upon which a verdict had been taken to the action brought to *July* term 1812. Admitting that this bond would enure for the use of private suitors in court as well as of the Commonwealth, concerning which I express no opinion, *Parham* could not compel an arbitration to ascertain the quantum of his demand in the action which he had commenced, but was left to his remedy by *scire facias* upon the judgment on the verdict, in the same manner that *Wallace* and *Maloney* have done. The attorney general brought the first suit upon the official bond, and obtained judgment on his verdict. To the next term he issued this *scire facias*, and has proceeded as quickly as the law would permit him. It is not competent to *Parham* to deprive the Commonwealth of the fruit of her officer's vigilance, and by a short cut to justice, unknown to the law, to frustrate the effect of this *scire facias*.

I have already said, that the evident intention of the bond was to secure the interests of the Commonwealth, and therefore can see no reason why judgment should not be rendered on this *scire facias* for 937 dollars and half a cent, the balance due on the penalty of this official bond.

BRACKENRIDGE J. concurred.

Judgment for the Commonwealth.