[PHILADELPHIA, DECEMBER 29, 1828.]

## The COMMONWEALTH *against* WEST.

### IN ERROR.

A prothonotary, who has received one thousand five hundred dollars for each year he was in office, is bound to account for, and pay over to the commonwealth, fifty *per cent.* upon all fees earned while he was in office, and received by his successor, and paid over to him after he has gone out of office. But the sureties in his official bond, are not liable, in case of his omission to account for, and pay over the amount due to the commonwealth, upon the fees thus received.

ON a writ of error to the District Court for the city and county of *Philadelphia*, it appeared, that this was a *scire facias*, issued to the *December* Term, 1827, by the Commonwealth of *Pennsylvania*, against *Timothy Matlack*, late prothonotary of the said court, and *William West* and *George Worrell*, his sureties, on a judgment for four thousand five hundred dollars, obtained on the 16th of *February*, 1824, on the prothonotary's official bond.

A case, of which the following is the substance, was stated for the opinion of the court below, to be considered as a special verdict.

*Timothy Matlack* was appointed prothonotary of the District Court for the city and county of *Philadelphia*, by a commission dated the 28th of *February*, 1821, and on the 6th of *March*, 1821, entered into a bond to the Commonwealth, in the penal sum of four thousand five hundred dollars, with *William West* and *George Worrell*, as his sureties. The bond, after reciting the appointment and commission of Mr. *Matlack*, as prothonotary, contained a condition in these words:

"Now, the condition of the above obligation is such, that if the above bounden, *Timothy Matlack*, shall, and does well and truly

(The Commonwealth *v.* West.)

and faithfully, in all things, execute and perform the duties of the said office according to law, and shall also, well and faithfully account for and pay over unto the state treasury, all public monies which shall come to his hands from time to time *during his continuance in the said office,* and also shall, when thereunto lawfully required, deliver up the records and other writings with the seal to the said office belonging, whole, safe and undefaced, to his lawful successor therein, then this obligation to be void, or else to be and remain in full force and virtue."

Between the 15th day of *March,* 1823, and the 4th day of *October,* 1826, both days inclusive, the said *Timothy Matlack* received from *John Goodman,* Esq., his successor in office, and *Randall Hutchinson,* Esq., also his successor in office, the sum of nine hundred and two dollars and fifty-eight cents, at the days and in the sums mentioned in a certain account, a copy of which was annexed to, and made part of the case.

The said *Timothy Matlack* received more than fifteen hundred dollars *per annum,* during his continuance in the said office.

The Commonwealth claimed, under the acts of assembly in such case made and provided, the sum of four hundred and fifty-one dollars and twenty-nine cents, being fifty *per cent.* on the said sum of nine hundred and two dollars, and fifty-eight cents.

Judgment having been entered on the 16th day of *February,* 1824, for four thousand five hundred dollars on the said bond, this *scire facias* was issued to recover the amount claimed by the commonwealth.

The writ of *scire facias* was returned " served," as to *William West,* and " *N. E. I.*" as to the other defendants.

Upon the case stated, the District Court rendered judgment in favour of the defendant; whereupon a writ of error was taken out by the Commonwealth.

In this court two questions were argued:

1. Is *Timothy Matlack* bound to pay the Commonwealth the amount claimed?

2. If he is so bound, is *William West,* his surety, liable upon the bond?

*Pettit,* for the commonwealth, referred to the act of the 10th of *March,* 1810, *sect.* 1, *Purd. Dig.* 608. *Act of the 24th of March,* 1818, *Purd. Dig.* 609. *Commonwealth v. Fitler,* 12 *Serg. & Rawle,* 277. *Lea* v. *Yard,* 4 *Dall.* 95. *S. C.* 3 *Yeates,* 344. *Roth* v. *Miller,* 15 *Serg.* & *Rawle,* 107. *Commonwealth* v. *Wolbert,* 6 *Binn.* 292, 296, 298. *Carmack* v. *Commonwealth,* 5 *Binn.* 184.

*J. Randall,* contra, cited *Act of the 13th of March,* 1817, *sect.* 2, *Purd. Dig.* 423. *Miller* v. *Stuart,* 9 *Wheat.* 680. *Arlington* v. *Merricke,* 2 *Saund.* 411, (*note.*) *Stibbs* v. *Clough,* 1 *Str.* 227. *Wright* v. *Russell,* 3 *Wils.* 530. *Montague* v. *Tidcomb,* 2 *Vern.* 518. *Harrison's Index,* 286. *Warner* v.

(The Commonwealth *v.* West.)

*Racy,* 20 *Johns.* 74.    Quin v. *The State,* 1 *Harr. & Johns.* 36.
*Commonwealth* v. *Baynton,* 4 *Dall.* 282.

The opinion of the court was delivered by

Gibson, C. J.—There cannot be a doubt, that the prothonotary himself would be liable; not, however, by force of the bond, but the act of assembly.    Although it be expressed in the act, that he shall account as if he had been in office at the time of receiving, the plain meaning is, that he shall account as if the fees had been received when he was in office.    He is to account only for the excess above a given sum, which it would be impossible to ascertain, as no one could tell what would have been the amount of his receipts had he remained in the office.    The terms of the act of 1818, clearly embrace the case of the officer; but the surety is liable no further than he is made so by the clear and explicit terms of his contract.    The condition of the bond is, that the prothonotary " shall faithfully execute and perform the duties according to law, and shall also well and faithfully account for, and pay over into the state treasury, all public monies that shall come to his hands, from time to time, DURING HIS CONTINUANCE IN THE SAID OFFICE."    By the letter of the latter clause, the liability of the surety is restrained to monies received while in office.    But it is insisted, that the accounting for fees received after the expiration of the official term, is, nevertheless, an official duty; because, fees being earned in an official character, could be recovered and accounted for in no other; consequently, that the surety is liable on the general clause for the faithful execution of the office.    To this there are two decisive objections: the first, that the parties themselves, did not intend to provide for this part of the subject by the general clause, having provided for it specially; and the second, that the general clause could be made subservient to the purpose, only by straining and inference, which are never employed to enlarge the responsibility of a surety.    The contract of suretyship is one of mere benevolence, and is not to be carried further than the natural import of the words, because it would be unjust to intend, that one who is to derive no benefit, would consent to be bound further than he chooses to express.    In doubtful cases, therefore, the construction is to be favourable to the surety.    I certainly do not pretend, that, at law, the liability of a surety, especially on a joint obligation, is to be distinguished from that of the principal; and if the prothonotary were before us, *in an action on* THIS BOND, I would not hold him liable.    But that the case of the surety should draw after it that of the principal, is surely more reasonable than the converse of the proposition.

To a common apprehension, then, an engagement for the faithful performance of an office, would seem to relate to its immediate duties, and not to those that are remote and consequential.    But the act of accounting for fees, even while in office, is, perhaps, not strictly

(The commonwealth *v.* West.)

an official duty, as it relates to a tax on the accountant's property, which is due by him, personally, and not in an official capacity. But there is, surely, nothing of an official cast in the act, after the functions of the officer have ceased, because a refusal to perform it would not subject him to impeachment. But the parties are not supposed to have weighed matters such as these. The natural and obvious purpose of the clause, was to give assurance of diligence and faithfulness during the tenure of the office, and not to continue the responsibility of the surety, indefinitely, afterwards.

Huston, J.—This case was argued on two grounds: 1. That *T. Matlack* is not liable; and, secondly, that if he is liable, yet his sureties are not.

Whether *T. Matlack* himself is liable, depends on the several acts of assembly.

The act of the 21st of *March,* 1777, 1 *State Laws,* (*M'Kean's,*) 58, requires all prothonotaries to give bond, &c., &c., for the faithful execution of their offices, and for the delivery of all books, records, papers, and seals, belonging to their respective offices aforesaid, whole, safe, and undefaced, to the person who shall be appointed to succeed them. (See the preamble and schedule to the present constitution and article 1st, which provides that all laws of this commonwealth in force at the time of making the said alterations and amendments in the said constitution, and not inconsistent therewith, shall continue as if the said alterations and amendments had not been made.)

The act of the 10th of *March,* 1810, *Purd. Dig.* 608, enacts, that prothonotaries, &c., &c., shall keep fair and accurate accounts of all fees received for services performed by them or for them in their respective offices; and shall annually furnish an account thereof under oath or affirmation to the auditor general, who shall examine the same, and, whenever the amount exceeds fifteen hundred dollars per annum, the auditor general shall charge the said officer fifty per cent. on the excess, which shall be paid by the said officer into the treasury of the state.

By the act of the 24th of *March,* 1818, *Purd. Dig.* 609, it is provided, " In case of the resignation or removal of any officer, who, by law is accountable to the state for certain surplus fees of office, it shall be the duty of his successor in office, who, from time to time may receive and pay over such fees to his predecessor, to take duplicate receipts for the same, and to transmit one of the said receipts to the auditor general, together with a statement of such fees as may otherwise be received by the said predecessor, as far as he may be able to ascertain the same. And it shall be the duty of the auditor general to settle the accounts of the late officer, to whom such fees shall have been paid, and compel him to account upon oath, and to pay over such proportion of the arrearages of fees so received as would have been paid to the state, had he *remained*

(The Commonwealth *v.* West.)

*in office*, allowing to such officer, in case of deficiency, in any year while he shall have held his said office, such sum as shall make up the whole sum he would have been entitled to have retained, free from any tax thereon.

It has been argued, that in construing the last sentence of the act of the 24th *March*, 1818, we must stop at the words *had he remained in office*, and that the latter part of the sentence has no connexion with or influence on the sense of the former. If this were so, it would introduce a new chapter on construction, and lead to a mode of ascertaining the meaning of a law totally different from what has been used since reading and writing came into use. Though these laws are not written in the most perspicuous language, the meaning cannot be mistaken by any but one whose interest it is to mistake it. The construction is, that each officer within its provisions, has a right to, and is to retain fifteen hundred dollars each year he continues in office, and pay to the commonwealth the one half of any sum he receives above fifteen hundred dollars. If he receives fees for services performed while in office, after going out of office, he is to account precisely as if such fees had been received while he was in office. If no year produced fifteen hundred dollars while he was in office, and he received fees after going out of office, the commonwealth had no right to any part of this until he had made each year of the office produce fifteen hundred dollars. If fifteen hundred dollars per annum during his office is received, the commonwealth is entitled to half of all received afterwards; for no law ever contemplated that any one should continue to receive fifteen hundred dollars per year, after his office had expired.

The court is unanimous in the opinion, that Mr. *Matlack*, the officer, is bound to pay to the commonwealth the sum demanded.

But admitting that Mr. *Matlack* is liable, it has, however, been earnestly contended, that the defendant, his surety, is not. And, first, as to the law respecting the liability of a surety. The officer and the surety sign the same bond, and same condition, are bound by the same instrument; and I know of no principle of law, which carries the liability of the principal one jot beyond that of the surety, so far as depends on the bond, unless in consequence of something which occurred on the part of the obligee, after the execution of the bond, or of some fraud in fact or law, at or before the execution of the instrument.

I shall notice the cases relied on by the defendant. The first is in 2 *Saund.* 411, *Arlington* v. *Merricke.* A person was appointed deputy postmaster for six months, and gave bond with the defendant as surety for the performance of the duties of his office. His appointment was renewed, and he continued after the six months and became a defaulter; and in a suit on the bond, it was decided, that the recital of an appointment limited the obligation to that appointment, and that the surety was not bound for what did not occur under it. All the cases cited in the note go this length, and no further, and con-

(The Commonwealth *v.* West.)

clude, that a surety is liable only according to and within the scope of his engagement.

The case in 9 *Wheat.* 702, 703, does not carry the law, nor profess to carry it, beyond those cases. The only real contest there was, whether the default occurred under the appointment recited in the bond, or under a different one; and the only positions of general application are, "A surety is not to be held liable by implication, beyond the terms of his contract; to that extent, and in the manner and under the circumstances pointed out in his obligation, he is bound, and no further." The words of a judge are to be taken in reference to the case trying; that is in his mind—with reference to the facts of that case he is speaking. If this is not kept in mind, error and confusion will follow. The judge's expressions are true in the case before him, perhaps in all cases; but he does not say or intimate that the instrument is to be construed in one way in a suit against the principal, and in a different way where a surety is defendant. And I do not know that any court ever said so. 20 *Johns.* 74, is a short and not very explicit case. There, a form of bond was prescribed by law; the officer gave a bond essentially different from this form, as the court thought; and the case trying did not come within the provision of the bond given; that is not this case.

In 6 *Binn.* 292, *Commonwealth* v. *Wolbert et al.*, the surety did not allege that he was not originally liable, but contended he was discharged by the conduct of the officers of the commonwealth. I shall not enter into a vindication of the policy of requiring sureties of public officers, because it needs no vindication, and because if it did, that cannot affect our decisions on those bonds. Is this within the true meaning and intention of the bond? What do the words, "Well and truly and faithfully, in all things, execute and perform the duties of the said office, according to law," mean? The law directed the officer to pay over this money; he accepted the office on the terms of doing so; it was his duty to do so. Although it occurred after the office expired, yet it was a consequence of the office, arose out of it, or rather it was still a part of it; as a sheriff may sell goods levied on while in office, may return writs, &c., after his office has expired; and an auctioneer who has sold goods and taken notes while in office, may collect the money after he is out of office, and he and his sureties are liable to the party interested, if he does not pay that money to the person entitled.

The case in 4 *Dall.* 96, is much stronger than this. There were two cases on two several official bonds of auctioneers against sureties. In the one the words were, "If the said *R. S. F.* shall well and faithfully discharge and perform all the duties of an auctioneer," in the other, "Shall well and faithfully execute the above office of auctioneer according to law, and shall from time to time well and truly account for all public monies which shall come into his hands, and pay the same into the treasury of the state," &c. The suits were not by the state, but by individuals whose goods the principals had sold, and

(The Commonwealth *v.* West.)

whose money they had collected and not paid over. SMITH, J., says, " Where there is a joint obligation, the law does not abstractedly, recognize the character of a surety; and after all, sureties must be bound according to the true construction of the obligation, whatever may be the form of expression;" and BRACKENRIDGE, J., says the bond embraces every duty which the officer is bound to perform; and judgment for the plaintiff was unanimously affirmed by the High Court of Errors and Appeals. According to this decision then, this first and general clause will embrace not only this debt, which it was the duty of the officer to pay to the state, but any money paid into court and which it was his duty to pay to a private suitor; and it further decides, that a second clause specifying an obligation to pay a particular claim; that is, specifying a particular duty, does not limit or restrain the general obligation to perform all the duties of the office. Besides what is called the second part of the obligation, " to pay into the state treasury from time to time all public monies which shall come to his hands during his continuance in the said office," is referrable to a distinct matter. All recognizances in the sessions are sued in the Common Pleas, and the money when collected, is paid into court; so, all the fines on defaulting jurors, or for contempt, &c. &c. To these the officer has no right; they are emphatically public monies, which come in from time to time. The commonwealth's share of that portion of fees which exceeds fifteen hundred dollars is not so distinctly public money, but is in effect the officer's money; at least till the settlement of his accounts, or until its amount is ascertained in some other way.

To conclude, these official bonds are of immense importance in this country. The commission, though made out, is never delivered until the bond is executed. The safety of the citizens, and security of the money of the state, depend in a great degree on them: their object is open and well understood, their construction long and repeatedly settled. The sureties sign them with a knowledge of all this. The law is settled, (see the cases cited, and 15 *Serg. & Rawle,* 107,) that there cannot be one construction as to one obligor, and another as to a second obligor, (except as before stated.) For these reasons I have come to the conclusion that the defendant is liable, but a majority of the court think otherwise.

Judgment affirmed.

## PHILLIPS *against* IVES.

### IN ERROR.

No wager concerning any human being, is recoverable in a Court of Justice.
Therefore, a wager, whether or not *Napoleon Bonaparte*, would, within a spe-
cified time, be removed or escape from the island of *St. Helena*, was *held* to
be illegal and void.

ERROR to the District Court for the city and county of *Phila-
delphia*.

*John Phillips*, the plaintiff in error, brought this action against
*Stephen Ives*, the defendant in error, to recover the amount of a
wager, the evidence of which was a written paper in these words:

" *May* the 14th, 1821. This day *Stephen Ives* bet one hundred
dollars to fifty dollars, with *John Phillips*, that *Napoleon Bo-
naparte*, will, at or before the expiration of two years from the
above date, be removed or escape from the island of *St. Helena*.
It is understood between the parties, that if *Bonaparte* should die
within the above period of two years, and on the island of *St. He-
lena*, Mr. *Ives* loses the bet.

(Signed,)      " *Stephen Ives*.
" *John Phillips*."

" This bet is made in the presence of

" *John F. Swift*."

It was proved on the trial, that the defendant acknowledged he
had lost the wager, and a verdict was given for the plaintiff subject
to the opinion of the court. The opinion of the court was divided
on the subject. The President held, that the wager was good and
the action sustainable. One of the associate judges was of opinion,
that, under no circumstances whatever, could an action be sustained
upon a wager; and the other, that in this particular case, an action
could not be supported. A majority of the court, therefore, gave
judgment for the defendant, and the plaintiff sued out a writ of
error.

*J. Randall*, for the plaintiff in error, contended, that, in *Penn-
sylvania*, an action upon a wager, can be sustained, except in cases
in which the wager is specially prohibited by act of assembly, or
void at common law. The case before the court, he said, depend-
ed on authority, and afforded an opportunity to test the value of
the principle of *stare decisis*. The subject has been frequently be-
fore the legislature, which, though it has thought proper to forbid
wagers of certain descriptions, has left wagers at common law un-
touched. It is not the province of this court, by judicial legisla-
tion, to do that which belongs to another branch of the government.

(Phillips *v.* Ives.)

*Steele* v. *Phœnix Ins. Co.* 3 *Binn.* 313. *Weidel* v. *Roseberry,* 13 *Serg & Rawle,* 180, 181. A wager, the subject matter of which is fair, is so far from being discountenanced by courts of justice, that it is fictitiously adopted as a form of deciding the most import-ant questions. The very substratum of a feigned issue is a supposed wager. Actions upon wagers claim a high antiquity; for, in the earliest books of entries, will be found the forms of declaring upon them. Nor, is the dignity of courts at all affected by being called upon to decide such controversies. An argument like this, is so complimentary to those to whom it is addressed, as to be received with some complacency; but, in the present instance it has no sup-port. It would interfere with the decision of many cases, in which at first, it might not be supposed to apply. What is a voyage to a foreign port but a wager upon the state of the market? Indeed, all the speculative transactions of life are, substantially, wagers. The whole subject of the impolicy of wagers was before the legis-lature, when, after the decision of *Morgan* v. *Richards,* 1 *Browne's Rep.* 171, and *Smith* v. *M'Master,* 2 *Browne's Rep.* 182, in which their validity was recognized, they passed laws to prohi-bit betting on elections, horse races, and other species of gaming, and left the general doctrine on the subject, as it stood before. The question then arises, is a wager good at common law? No princi-ple is better established by authority, than, that they are so, when they do not interfere with good morals, or with the provisions or policy of the law. The lawfulness of wagers was recognized as long ago as 44th *Elizabeth.* In *Walcot* v. *Tappin,* 1 *Keb.* 56, 65, *S. C.* 1 *Lev.* 33, the action was upon a promise, that in consi-deration of twenty shillings, the defendant would give twenty pounds if *Charles Stuart* should be King of *England* within a twelve-month. The King was in exile when the bet was made, which was about six months before his restoration. The defence was put solely on the ground of want of consideration, because the subject of it was, in contemplation of law, King of *England* at the time of the contract. No objection was taken, either to the legality of wagers generally, or to the particular one in question; and, not-withstanding it was upon a political subject of deep interest to the nation, the plaintiff had judgment. The same objection, want of consideration, and no other, was taken in the case of *The Earl of March* v. *Pigot,* 5 *Burr.* 2802, in which the plaintiff and defend-ant agreed, at *Newmarket,* after dinner, to run the life of Sir *Wil-liam Codrington,* against that of Mr. *Pigot's* father. The latter died at two o'clock in the morning of the very day on which the bet was made; but this fact was not known to the parties, and the defence was, that, as the defendant could not possibly win, he ought not to lose. The plaintiff had a verdict; and a rule to show cause why there should not be a new trial, having been granted, it was, af-ter argument, discharged by the unanimous opinion of the court. A wager, whether a decree of the Court of Chancery would

(Phillips *v.* Ives.)

be reversed or not, on appeal to the House of Lords, it was determined in *Jones* v. *Randall, Cowp.* 37, might be recovered, unless the motive be fraud, or other *turpis causa.* In *Harrison's Digest, Title Gaming, Subdivision Wagers,* the cases are brought together, and it will be found, that though the judges have sometimes expressed doubts as to its propriety, yet the validity of wagers, in general, is uniformly treated, established legal doctrine. In *New York,* it has been fully considered and recognized. *Bunn* v. *Riker,* 4 *Johns.* 436. *Campbell* v. *Richardson,* 10 *Johns.* 406. The validity of wagers, unless they be illegal, immoral, or indecent, has been fully admitted, too, in *Pennsylvania,* by a judge, whose strict moral sense would have led him to a different result, if he had not considered the law too well settled to be called in question. *Morgan* v. *Richards,* 1 *Browne's Rep.* 171. *Smith* v. *M'Masters,* 2 *Browne's Rep.* 182. The subject matter of the present wager, between two *American* citizens, was perfectly harmless. It offended against neither law nor morals. It was a mere matter of speculation, interesting, it is true, throughout the civilized world, from the character of the extraordinary person to whom it related, but, in a national point of view, wholly immaterial. It could afect neither the life nor the security of the great state prisoner, had he been alive. Both were effectually protected by the great precautions taken by the *British* government. But, in fact, when the bet was made, he was actually dead, a fact well known as a matter of history.

*P. A. Browne,* for the defendant in error.—This case presents a peculiarly fit occasion for this court to determine, whether contracts, which every one admits to be immoral in their nature, and pernicious in their consequences, are good in law. It cannot, it is true, be maintained, that no wager, of any description, is valid, but, it may be contended—

1. That, by the common law of *Pennsylvania,* no wager is recoverable in which the parties have no other interest in the subject matter, than that which they themselves create by the wager. This position is an answer to the argument derived from the adoption of a fictitious wager, in feigned issues, in which there is always a stipulation, that the wager itself shall not be recovered. Even the use of such a form has been regretted by a learned judge of this court. *Brack. Law Misc.* 211. Among other sources of the common law of *Pennsylvania,* we are to look to the decisions of the courts of *England* prior to the revolution, and it may be safely affirmed, that there is no *English* case, prior to the 4th of *July,* 1776, in which it has been decided, *upon the point being made,* that a wager upon an indifferent subject might be recovered. This court is, therefore, entirely unfettered by transatlantic authority; the decisions subsequent to the revolution not being binding. The earliest case is that of *The Monopolies,* 11 *Coke,* 84, in 44*th Elizabeth,* cited on the other side; in which the question was, whether the Queen's grant of a

(Phillips *v.* Ives.)

monopoly for the making and importation of playing cards, was void; and the only part of the case which has any bearing upon the present question, is that in which it is said, that playing cards and dice is not prohibited by the common law. In the case reported under different names, in 1 *Keb.* 56, 65, and 1 *Lev.* 3, upon the wager, whether *Charles Stuart* would be king within a certain period, no point was made, whether a mere idle wager was good, which was taken for granted. It was not noticed either by the counsel or the court. It is, at most, therefore, a mere negative precedent, and no decision. In *Danvers* v. *Thistlethwait*, *Sid.* 394, and *St. Leger* v. *Pope*, 4 *Mod.* 406, 409. 5 *Mod.* 1, 4, the question was, whether the particular bet was within the statute against gaming. Neither in this, nor in any of the other cases decided before the *American* Revolution, was the general question ever raised. Since the revolution, the broad question, it is true, has been decided; never, however, without expressions of regret, that the law was, as it was believed to be, and in opposition, too, to the opinions of many distinguished judges. This court then, not being bound down by authority, are at liberty to recur to first principles, as the foundation of their decision. In the two cases cited from 1 and 2 *Browne's Rep.*, the point was not made. If it had been, from the character of the presiding judge, it cannot be doubted, that his decision would have been against the legality of an idle bet. The decisions in *New York* cannot inform us as to the common law of *Pennsylvania*, which consists of what our fathers brought with them from *England*, and of what has been since established, as applicable to the condition of a moral and religious people. In a republican government particularly, whose very foundation is purity of morals, it is against principle and against morality, to give a legal sanctity to gaming. In *England*, where the policy is to preserve great hereditary wealth in particular families, the objection to it is not so strong as in a country, the policy of which is to keep the people as nearly on a level with each other as possible, and to promote habits of industry, which are invaded by nothing so much as the spirit of gaming. We are not without example in this matter. The act of Parliament against wagering policies does not extend to this country; yet it has been expressly decided that such policies are void in *Pennsylvania*, because they are against principle. *Pritchet* v. *Ins. Co.* of *North America*, 3 *Yeates*, 458. This court upon principle, and without authority to guide them, decided in *The Commonwealth* v. *Sharpless*, 2 *Serg. & Rawle*, 91, that the private exhibition of an indecent picture, was an indictable offence. The broad principle, that good morals were part of the law of the land, was the only foundation of the decision; and surely gaming is more pernicious in its effects upon society, than the exhibition of a picture, however indecent.

Besides, the *English* decisions referred to, are merely decisions of courts of law; for equity not only uniformly refuses to lend its