[PHILADELPHIA, JANUARY 25, 1830.]

## The Case of FIELD'S Estate.

A promise to pay a specialty debt, which has been discharged by a certificate of bankruptcy, does not revive the original debt, as a debt by specialty. The original debt is merely a consideration, which renders the new promise available.

APPEAL from the decree of the Orphans' Court of *Philadelphia* county, on the settlement of the account of *Joseph Field*, administrator of *John Field*, deceased, and the distribution of the assets among the creditors of the said intestate.

The auditors to whom this case was referred, made to the Orphans' Court a report, of which the following part only is material:

" The auditors further report, that *John Field*, the intestate, was, on the 8th day of *March*, 1804, discharged under the bankrupt law of the *United States*, and regularly obtained his certificate of having conformed in all things to the provisions of the act of congress on that subject: That the specialties or bonds, on which Messrs. *West* and *Yarnall* claim, are both dated previous to that time; but, in relation to the claim of *William West*, the auditors were satisfied that the intestate, after his discharge re-assumed the said debt and continued to make payments on account of principal and interest, until the 15th *April*, 1823: That an amicable action of debt was entered on said note in the District Court for the city and county of *Philadelphia*, to *September* term, 1819; and that, on

(The Case of Field's Estate.)

the 8th of *May*, 1820, *John Field*, the defendant, delivered to the plaintiff certain promissory notes of *David Kendrick*, (which notes have not been paid) as a collateral security for the balance due on the said note, and took a receipt for the said collateral security, particularly describing the original sealed note. The auditors, conceiving that these circumstances amount to a re-sealing and delivery of the original note, have allowed the same as a specialty. The claim of *E.* and *E. Yarnall*, is on a bond dated *February* 21, 1799, of *John Field*, in favour of *Nicholas Waln* and *William Wilson*, guardians of *Joseph Head, Ellis Yarnall* and *Samuel Coates*, conditioned for the payment of three thousand dollars, with interest, in the following proportions, to wit: one thousand dollars to *Nicholas Waln* and *William Wilson*, one thousand to *Ellis Yarnall*, and one thousand to *Samuel Coates*. In relation to this claim, it appeared in evidence, by the testimony of *Ellis Yarnall*, one of the original obligees, who assigned his interest in this demand to the claimants, at one of the meetings of the auditors, that immediately before, or just after the discharge of *John Field* under the bankrupt law, he informed the witness he had placed notes *in* the hands of his friends to meet this debt: That, several years after, (the money not having been paid) the witness again applied to *John Field*, and was then informed by him that he had a judgment against the estate of *Daniel Williams*, on which execution had been issued, and the real estate of the defendant, situate in the Neck, levied on and sold by the sheriff, and purchased for the use of said *Field:* That the title of *Williams* was disputed, but he had brought a suit against the person in possession, and, in case he recovered the land, he would pay this debt. The witness was not certain whether he was to pay it out of the money to be received for the said land, if it was recovered, or not. The intestate offered, if the witness was not satisfied with this, that he would make an assignment of the suit to him. He also stated that there were other lands of *D. Williams*, on which he had levied his execution, and he had no doubt that, out of these lands, enough would be received to pay this debt. A few days previous to the last of *June*, 1823, the witness again urged *John Field* for payment; he answered, he always considered *Daniel Williams'* property ought to pay this debt, because the original security was on it, though the money was for his, *John Field's*, use; he levied his judgment on that estate, and would pay out of it. The original bond was accompanied by a mortgage of *John Field* and wife, on property which descended to her from her father, *Daniel Williams*, but which was sold by the sheriff, and the whole of the proceeds appropriated to the payment of prior incumbrances. The property in the Neck levied on and sold by the sheriff, as the property of *Daniel Williams*, contained eighty-seven acres, one quarter and twenty perches; it was purchased by *Joseph Clark*, for *John Field*, and conveyed to *Field* on the 18th day of *April*, 1818. On the 24th of *April*, 1818, *Field* conveyed a part of it (nine acres,

(The Case of Field's Estate.)

three quarters and twenty-seven perches) to *Stephen Girard,* in consideration of the sum of three thousand dollars, but whether he ever obtained possession of the remainder, or any part of it, the auditors had no evidence. Conceiving this to be a promise to pay out of a particular fund, the auditors have allowed the amount proved to have been received from that fund by *John Field,* with interest; but as there was no evidence of any re-sealing or delivery of the bond, they have allowed it as a simple contract debt."

To this report, the following exceptions were filed:

"1. That the auditors have erred in not allowing the claim of the above named *Ellis H., Edward* and *Charles Yarnall,* assignees of *Ellis Yarnall* and *Samuel Coates,* who survived *Nicholas Waln* and *William Wilson,* as a *specialty* debt, the same claim being founded on a bond made and executed by *John Field,* the above named intestate, in favour of *Ellis Yarnall, Samuel Coates, Nicholas Waln* and *William Wilson,* which bond bears date the 21st of *February,* 1799.

"2. That the said auditors have further erred in calculating the interest from the 24th day of *April,* 1818, instead of calculating from the day of the date of the said bond, when it commenced, allowing a credit for the payments of the interest which have been made, and which are indorsed on said bond, until the interest should amount, together with the real debt, payable by the condition of the said bond, to a sum equal to the penalty thereof, or until the day the auditors signed the report."

Decree of the Orphans' Court, pronounced by KING, President:

" The exceptions to the report of the auditors, raise two questions for the decision of the court. *First,* Whether the exceptants are specialty creditors? *Second,* From what period is interest to be calculated upon the debt? The facts are few and unequivocal. *John Field,* the intestate, on the 2d *February,* 1799, executed a bond to *Nicholas Waln* and others, conditioned for the payment of three thousand dollars. On the eighth of *March,* 1804, the bond being due and unpaid, *Field* obtained his certificate as a bankrupt, under the existing act of congress of the *United States.* There is no evidence in the cause, that *Waln* and others, ever proved their debt under the commission, or received any dividend of the effects of the bankrupt. On repeated occasions, between the time of his bankruptcy and his death, which took place in ———— *Field* promised the exceptants to pay this bond as soon as he could realize funds from a particular source, to which he referred. Before his death, the property from which he contemplated payment came into his hands. The auditors have considered the claim of the exceptants as arising from simple contract, and not as a bond debt, and have allowed interest upon it from the 24th *February,*

(The Case of Field's Estate.)

1818, the day upon which *Field* received three thousand dollars from a purchase of part of some land recovered by him, and which was the source from which, when rendered available, he promised payment to the exceptants. The questions involved in this case lie in a narrow compass, though the result of their decision is of considerable pecuniary interest to the parties. It is unquestionable law that a promise made by a bankrupt to pay a debt barred by his certificate, again subjects him to a legal liability for its payment. The only dispute appears to be, whether it revives the old debt, or whether the old debt is a good consideration for the new promise. It seems, in practice, that declarations are framed upon either and both these views, and have been equally sustained. *Trueman* v. *Fenton, Cowp.* 544. *Cooke B. L.* 526, *Selwyn N. P.* 272, 1 *Chitty*, 40. 8 *Mass. Rep.* 127. 4 *Johns. Rep.* 36. 14 *Johns. Rep.* 178. *Comyn on Cont.* 427. All these cases have arisen from original parol contracts, where no settled rule of pleading was interfered with, by either mode of declaring. When, however, a debt, due before bankruptcy, arose from a specialty, it is difficult to understand how any other than an action upon the specialty could be sustained against the bankrupt in the event of a new promise. It is a rule as firmly settled as any in the law, that *assumpsit* will not lie upon a promise to pay a debt secured by specialty, unless upon a new consideration. *Landis* v. *Urie*, 10 *Serg. & Rawle,* 321. *Cowp.* 129. 1 *Dallas*, 208. 1 *Bac. Ab.* 257. *Assumpsit, A.* Upon a promise, then, after bankruptcy, to pay a bond debt, and where the only consideration for the promise is the old debt, the promisee must recover on his bond, or he cannot recover at all. This view of the subject would seem to go far towards supporting the doctrine contended for by the exceptants. But the technical rules of pleading are only important so far as they serve to illustrate principles, and the question before the court must depend for its solution upon what is the legal effect of bankruptcy upon antecedent debts. Considered with reference to a subsequent promise of payment made by the bankrupt, my view of the statutes of bankruptcy and limitations is, that they are but *legal exemptions,* which, if judicially interposed, relieve a party from obligations otherwise enforceable in law, and subsisting in morality and good conscience. If the party entitled to avail himself of the exemption, either expressly waives it, or tacitly, as by omitting to plead it, it is the same with reference to the claim which is the subject of controversy, as if these statutes had never operated on it. Before the *waiver* the obligation was imperfect; a subsisting right, the remedy for which was arrested by positive law, from reasons of general convenience; by it, right and remedy are reunited, and the obligation becomes complete. These are apparently the views of the Chief Justice, as expressed in *Jones* v. *Moore,* 5 *Binn.* 577. He says that a debt barred by the statute of limitations *is not extinguished;* that it remains due in conscience, and, in some respects, at law; for,

(The Case of Field's Estate.)

if the defendant omits to plead it, he is considered as having waived the benefit of it, and the plaintiff may recover against him. In the recent case of *Willing* v. *Peters*, 12 *Serg. & Rawle*, 177, the same doctrine is considered as applicable to the case of bankruptcy. Indeed the language of the court, in this case, goes far towards the decision of that before us. ' No recovery,' says the Chief Justice, ' can be had against the bankrupt; yet, by the common sense and feeling of mankind, the debt exists, until it be actually paid.' The necessity of pleading bankruptcy, (*Chitty*, 474) is strong evidence that it is viewed as only affecting the remedy. If this is correct doctrine, and I do not doubt it, the present question is settled by it. *Nicholas Waln* and others were *the just bond creditors* of *John Field.* By law their remedy against him was destroyed, although their right, abstractedly considered, remained unimpaired. He voluntarily, as he could lawfully do, removed this legal bar, and in doing so remitted the exceptants to all their original rights. In the opinion of the court, the first exception is sustained.

" The question of interest I can scarcely consider as open, after the decision of the Supreme Court in the case of *Schultz's Appeal*, 11 *Serg. & Rawle*, 182. There a bond creditor of an insolvent estate was allowed interest upon his bond to the time when the assets were apportioned. The exceptants are entitled to interest upon their bond, until principal and interest equal their penalty, which is all they ask for. Upon this principle the auditors will settle the interest account. The report of the auditors is set aside, and recommitted to them, with directions to report a new distribution, according to the principles of this decree."

*Exception to the Decree of the Orphans' Court.*

" That the said court have admitted *E. H.* and *E. Yarnall* to a claim upon the fund in the hands of the administrator, as specialty creditors, when they were no more than simple contract creditors."

*W. Smith*, for the appellants.—The preference given by law to specialty creditors, both in *England* and in this country, is no favourite in courts of equity. The origin of this preference cannot be traced, nor can any good reason be given for it. In *England*, the courts distinguish between legal and equitable assets, and whenever they can, make an equal distribution. In *New York*, the same principles have been adopted. *Field*, who had received an absolute discharge from his debts, afterwards, unknown to his other creditors, promised to pay a particular creditor, who now attempts to sweep off every thing. His claim is highly inequitable, and the court will lay hold even of technical means to do equal justice. The bond debt having been completely discharged by the bankrupt law of the *United States*, (*Story's Laws of U. S.* 744) it could not, from its very nature, be revived, except by the same solemnities which gave it existence. No case can be found in *England* to

(The Case of Field's Estate.)

support the doctrine contended for on the opposite side, which is strong negative evidence against it. The only cases to the point are *Seabury* v. *Martson*, 2 *Penn. Rep.* 702, and *Ludlow* v. *Vancamp*, 2 *Hals.* 113, both of which are against it. The cases which may be cited to show that a new promise revives the old debt, are not to the purpose. They are all cases of simple contract debts, and debts barred by the act of limitations, where the debt itself was not discharged, but the remedy taken away. All these decisions turn upon the form of pleading, the idea of the old debt being revived by a new promise, being resorted to to support the declaration.   There is no case in which the court had occasion to look to the nature of the debt itself.

*Bouvier, contra.*—Both parties being entitled to payment, if the assets be sufficient, they have equal equities; and the court must decide this cause upon legal principles. A discharge under the bankrupt law is not payment, and nothing short of payment will absolutely discharge the debt. It cannot be called payment, because nothing is paid, and, consequently, the debt is not extinguished. If it were extinguished, a new promise would be *nudum pactum*, which is not pretended. Such a discharge is merely an exoneration from liability, until the debtor thinks proper to resume it; it is a bar to the remedy, not to the right. It makes the debt voidable at the option of the debtor, who may plead his certificate or not, according to his pleasure. It is aptly said, by one of the judges in one of the *New Jersey* cases cited on the other side, that a debt like this has a body and a soul, and though the body be dead, the soul lives, and the moment it is breathed again into the body, it brings it to life. Not only numerous cases, but all the precedents show that it is the old debt, which is to be recovered by virtue of a new promise, and not a debt, the consideration of which is a new promise. If the original debt be revived, it is, of course, revived in its original character. 1 *Chitty Pl.* 473.   *Lord* v. *Shaler*, 3 *Conn. Rep.* 131. *Levy* v. *Cadet*, 17 *Serg. & Rawle*, 128. *Jones* v. *Moore*, 5 *Binn.* 577.   1 *Chitty Pl.* 40.   1 *Cooke's Bankt. Law*, 526. 1 *Selw. N. P.* 272. *Maxim* v. *Morse*, 8 *Mass. Rep.* 127.

The opinion of the court was delivered by

GIBSON, C. J.—It seems to be agreed that a debt discharged by a certificate of bankruptcy, is a valid consideration for *a promise.* How this opinion came to be adopted, I am at a loss to imagine. Contracts are made in reference to the existing laws which tacitly become a part of the stipulations of the parties; so that the creditor, looking to the possibility of the debtor's bankruptcy, indemnifies himself for the risk in the enhanced price of his commodity; and standing his own insurer, he cannot, even in conscience, object to bearing the loss. Beside, having taken the benefit of the commission, at the expense of all the bankrupt's remaining prospects, he elects to receive in full satisfaction exactly what the law allows him,

(The Case of Field's Estate.)

and absolves the bankrupt from further obligation, either in honour or conscience. The only debt to which this is inapplicable, is that of a loan, originating in pure benevolence. But a promise to pay an antecedent debt, would be a positive breach of faith to those who had given credit on the foot of the certificate. But, whatever we may suppose the law ought to have been, it is settled by a train of decisions not now to be questioned, that a debt discharged by a certificate of bankruptcy, is an available consideration for a new promise. Still the new promise, and not the old debt, is substantially the meritorious cause of action, although it may be treated differently in the pleadings. The form of the declaration was doubtless produced by a notion which long prevailed, that a debt, although barred, might nevertheless be REVIVED, by any acknowledgment which amounted to a waiver of the bar. This notion is now exploded, both here and in *England;* it being held almost universally, that a recovery can be had only on a new promise, of which an acknowledgment of indebtedness may be evidence. Still the anomaly of declaring on the old promise remains. There is, however, but one case in the *English* books in which an opinion was intimated that a *specialty* might be revived by parol. The question could not arise on the statute of limitations, which has no effect on specialties; and cases of presumption, from length of time, are not to the purpose. There, an acknowledgment of the debt operates as evidence, not of a new promise, but to rebut an inference of payment; consequently, the recovery is of the old debt, the remedy having never been barred, or even suspended. But had the notion now pressed on us received countenance, it would have given rise to frequent litigation, in cases of bankruptcy; yet we find, in the *English* books, the solitary case of *Alsop* v. *Brown, Dougl.* 192, in which Lord MANSFIELD undoubtedly intimated that a bankrupt's acknowledgment of the debt might render him liable on his bond, as on a new contract. This, however, was said with apparent hesitation, and at a time when the doctrine of revival under the statute of limitations was at its meridian.

Such, then, being the state of the *English* decisions, how stands the matter nearer home? In *Jones* v. *Moore*, 5 *Binn.* 573, our own court, I believe, led the way in returning to a rational construction of the statute of limitations, by holding that the acknowledgment of debt barred by it is not a revival of the debt, but evidence of a new promise. I pretend not to speak with certainty, but I am not aware that any court of a sister state had preceded it. It is more to the purpose, that the doctrine now prevails generally, if not universally; and thus it stands as to debts by simple contract, under the statute of limitations. In *Ludlow* v. *Vancamp*, 2 *Halsted*, 113, the Supreme Court of *New Jersey* was divided in opinion on the question whether a bond barred by their statute of limitations, was even a consideration for an express promise to pay it, no doubt being entertained by any of the judges, that the plaintiff was

(The Case of Field's Estate.)

without remedy, on the bond itself. I have found no other case where the debt was originally due by specialty, and but the case of *Maxim* v. *Morse,* 8 *Mass.* 127, where it was by record; and there it was held that a judgment from which the defendant had been discharged by a certificate of bankruptcy, might, by a subsequent promise, be made the foundation of an action of debt. Thus we see that, against this case and *Alsop* v. *Brown,* are arrayed all the decisions in *England* and this country; and how does the question stand on principle? A bond is not the debt itself, but evidence of it; and, although there may be a duty independent of the instrument, yet a subsequent promise ought not, one would think, to preclude the party from showing an original want of consideration, even at law. Beside, it is impossible to conceive how an instrument can regain its properties, once lost, except by a repetition of the solemnities from which it originally derived them; and nothing is clearer than that a promise to pay, is not a new delivery. The argument is, that a waiver of the bar estops the obligor from taking advantage of it, so that the bond necessarily stands before the court on original grounds. There undoubtedly is such a thing as an estoppel *in pais;* but it is always by an act done, such as partition, entry, livery, acceptance of rent, or of an estate. Beside, no estoppel is to be taken by inference or argument, even in pleading. It ought to be a precise affirmation of that which makes the estoppel, which this promise is not; and the doctrine, although beneficial in many respects, is not to be extended to new cases. I am, therefore, of opinion that the debt in question is not entitled to rank as a specialty.

HUSTON, J. dissented. SMITH, J. concurred with GIBSON, C. J. ROGERS, J. and TOD, J. did not hear the argument, and took no part in the judgment.