# Postens *against* Postens.

*It seems*, questions may be asked to support the character and standing of third persons called in to assist others in a settlement of accounts, though they have not been first attacked, if the opposite party has previously asked questions indirectly reflecting on them.

An answer, however, that their characters stood fair, being no more than the law implies, is not error.

Declarations of the grantor, after parting with his title, are not evidence to support or impeach it in the hands of the grantee, but if part of a conversation is given by one party, the other may inquire into the whole.     .

Declarations, part of the *res gestæ*, are evidence, and are evidence to show the relations of parties towards each other.

A court of error will not reverse for the admission of irrelevant evidence, when no prejudice appears to have been done by it.

A judgment cannot be collaterally questioned, unless for covin or collusion.

The endorsement of the obligor on a single bill, many years after its date, promising to pay at a certain time, is evidence to rebut the presumption of payment arising from lapse of time, though it would not revive such an instrument after being barred by a statutory provision.

**THIS** was a writ of error to the Common Pleas of *Monroe* county.   It was an ejectment brought by James Postens against

[Postens v. Postens.]

William Postens, to recover a tract of 106 acres of land, in which a verdict and judgment were rendered in favour of the plaintiff below, James Postens.   It was the same land which was the subject of a former ejectment by William Postens against James Postens, in which William Postens succeeded, and which is reported in 4 *Whart.* 27.

Both parties were sons of Jacob Postens, deceased, and derived title under him; the plaintiff claiming as purchaser at sheriff's sale under a judgment and execution against the administrator of Jacob Postens, and the defendant under a deed to him from Jacob Postens in his lifetime.

The plaintiff gave in evidence a judgment on the 25th March 1832, in a suit by Jacob Stroud's executors against James Postens, administrator of Jacob Postens, deceased, for $474.57, and sale thereon by the sheriff on an *alias venditioni exponas*, and a sheriff's deed, dated 29th November 1833, to James Postens, the plaintiff.

The defendant then produced a deed dated the 18th December 1828, from Jacob Postens to himself, recorded the 20th December 1828, and showed that notice of it was given at the sheriff's sale above mentioned.   This deed, in consideration of $2000, conveyed " a piece of land containing, by estimation, 106 acres, more or less, being the full half of the farm whereon Jacob Postens now lives, and known and distinguished by the back end of said farm, and embracing the land whereon the new barn was built for the said William Postens, as it has been said," &c.

The plaintiff, in order to prove that Jacob Postens, the grantor, was indebted at the time of this conveyance, which was alleged to be a voluntary one, gave in evidence the cause of action in the above-mentioned judgment, viz: first, a bond dated November 25th 1795, Jacob Postens to John Lee, in the penalty of £66 10s 8d, conditioned for the payment of £33 5s 4d, on the 16th of April 1796, with an endorsement signed by Jacob Postens, without date, promising to pay the amount to the executors of Jacob Stroud, on the 1st June 1830, witnessed by James Postens, and a receipt 29th June 1830, of $50 from James Postens on the same: second, a bond of the same date, between the same parties, and with like penalty, condition and endorsement, with a receipt of $35.31, from James Postens on account.

The plaintiff, also, gave in evidence two other judgments against Jacob Postens, at the suit of himself, one entered January 31st 1829, for $527.37, on bill obligatory of the 2d August 1810, for $250, with interest; the other entered 31st June 1829, on bond and warrant of attorney dated 27th January 1829, for $3311.62.

The plaintiff then produced and proved by William V. Buskirk, a settlement in writing between Jacob Postens and his son James Postens, which was the consideration of the bond for $3311.62. It was a statement of James's claim for wages, with interest from year to year, beginning August 2d 1811, and ending April 27th 1829,

[Postens v. Postens.]

cast up in the sum total, amounting (after several deductions for clothing, medicine, &c.,) to the sum of $3311.62, signed by Jacob Postens and James Postens, and countersigned by Jacob Brown, William V. Buskirk, and Simon S. Wetherill, as done in their presence, January 27th 1829.

The defendant cross-examined this witness as to Jacob's being aged, and with poor hearing, and having had a stroke of the palsy, and getting asleep occasionally, and as to the circumstances attending the transaction, and the manner in which the three persons, together with Daniel Stroud, who was called on to act as their clerk, conducted themselves in their inquiries and examinations, during the settlement of the accounts between the father and son, and the footing they were on with them. The plaintiff then offered to ask the witness the following question: What was the character and standing of S. Wetherill, Jacob Brown, and Daniel Stroud? To which the defendant objected, and the court overruled the objection and sealed a bill of exceptions.

The witness then stated, that they stood very fair, as far as he knew, and proceeded to state other matters; one of which was, that they were not arbitrators—they were there to help them settle.

The plaintiff afterwards called Jacob Brown, to show the settlement to have been deliberate and fair. Both these witnesses stated that James Postens came for them, to come and help at the settlement.

The defendant then went into evidence respecting the deed to him. That it was made to the defendant at the time of his marriage with a daughter of Capt. Hornbeck, it being understood or expected by Jacob and William, that Capt. Hornbeck would give his daughter an equivalent. Hornbeck subsequently conveyed to William land in New Jersey, said to be of equal value. No money was paid by William to his father. Some witnesses said, the arrangement was, that Hornbeck was to convey to William a certain mill property in Jersey, different from that which he did convey; and that Jacob and William afterwards complained that he had not. William did not go to live on the tract in dispute, but resided in Jersey. The defendant also gave a great deal of evidence to show that James rented the place of his father, and never worked for him for wages; and on this point the evidence was contradictory. He also gave evidence to prove that Jacob, at the time of the settlement, was 75 years old, infirm, and not capable of transacting business.

Rebutting evidence was given by the plaintiff on these and various other matters. Among others was the deposition of Jacob Sheimer, of which the following portion was objected to by the defendant, but admitted by the court, and exception taken.

"In the latter part of the winter following the fall when the deed was executed, I was at the old man's house, who complained

III. — 17

[Postens v. Postens.]

that Capt. Hornbeck was to do certain things which he had not done; that he was to have given to William a deed for the place on which William then lived, called the mill property, but had not done it; at the same time saying, that he had always intended that William should have the property that he had given him a deed for, and wished him to come and live on it; that it would be a home for them; and that Capt. Hornbeck was to have given William a deed for the mill property, if he gave William a deed for the premises in question; and complained that Hornbeck had not done as he had promised."

The plaintiff further gave in evidence the declarations of the defendant, that Hornbeck was to convey to him the mill property.

The plaintiff offered to prove the value in 1830, and 1831, of a tract of land in Chesnut Hill township, which belonged to Jacob Postens. To this the defendant objected, but the court admitted the evidence and sealed a bill of exceptions.

The plaintiff also offered to prove Jacob Postens' declarations as to James Postens' management of the farm; which was objected to, and admitted, and exception taken by the defendant.

The plaintiff offered to prove Jacob Postens' declarations, that he had hired James; which the defendant also objected to, but the court admitted, and sealed a bill of exceptions.

The plaintiff offered to prove by Stogdell Stokes, a sale to the witness by William Postens, in 1819, or 1820, of a house and lot in Stroudsburg, for $1100, of which he paid in goods, &c., $832, and gave Jacob Posten's credit for the rest; William saying at the time, he was about moving to Jersey, and his father could make the witness a title. To this the defendant objected, but the court admitted it, and exception was taken by the defendant.

Daniel Stroud, Esq., was called as a witness by the plaintiff, and on his cross-examination by the defendant, said, that James Postens called on him to attend the settlement. The plaintiff then offered to prove what James Postens said to the witness at the time he called on him to attend the settlement as stated above, in relation to his attending the settlement. To this the defendant objected, but the court admitted it, and the defendant excepted. The witness stated that James professed to deliver a message from his father.

The plaintiff proposed to the court the following points:

1. That the acknowledgment of Jacob Postens on the bond held by the executors of Jacob Stroud, deceased, did not create a new debt from that time, but by repelling the presumption of payment left the original debt in full force.

2. That the judgment of James Postens on the single bill of 1810, was in point of law, for a debt precedent to the conveyance to William, and that if the judgment, No. 72, of January term 1819, was also for indebtedness incurred previously to December

1828, it is also a debt precedent to such conveyance, and if the conveyance tended to delay, hinder, or defeat its collection, it is void.

3. That if at the time of the conveyance of the 18th of December 1828, Jacob Postens had not other property sufficient beyond doubt to pay his debts, such indebtedness avoids the conveyance.—*Admitted*.

4. That the circumstance of William Postens never having taken or attempted to take possession of the property during his father's lifetime, is a strong circumstance to show the voluntary character of the conveyance.—*Admitted*.

5. That even if it were agreed on the 18th December 1828, between Jacob Postens and Benjamin Hornbeck, that each would settle $2000 worth of property on their child, that would not be good against creditors at the time, more especially if Hornbeck did not carry his agreement into effect, until nearly 18 months after, or if he could not have been legally compelled to do so.

6. That if Jacob Postens was induced to execute the deed of 18th December 1828, to William Postens, by a promise of Jacob Hornbeck, that he would convey the mill property spoken of by the witnesses to his daughter, the wife of William Postens, which he did not then mean to perform, and has not yet performed, it was a fraud upon Jacob Postens, and no title would vest in William under that deed.

7. That the judgments of Stroud's executors, and of James Postens, against Jacob Postens, are evidence of indebtedness to the amount, and unless they are proved to be fraudulent or collusive, they ought to be considered by the jury as evidence of the debt to that amount.

The court charged the jury in substance as follows:

The parties claim title to the land in dispute under their father, Jacob Postens. The plaintiff derives his title under a judgment entered in Northampton county on the 26th March 1832, upon a bond given in the lifetime of Jacob Postens to Jacob Stroud. The deed of the sheriff under this judgment to the plaintiff, is dated 29th November 1833, and vests in him all the interest of Jacob Postens at the time of his death to the lands in controversy. The defendant claims the land by virtue of a deed from Jacob Postens dated the 18th of December 1828, recorded on the 20th of the same month. This deed being older than the judgment under which the plaintiff claims, and having been duly recorded, conveys the better title, unless from the evidence it should appear to the jury that it had been obtained by fraud, or being a voluntary deed, is defeated by a prior indebtedness of Jacob Postens. The voluminous evidence in this case has been introduced for the purpose of affirming these two positions, and on the part of the defendant of repelling them. The first inquiry then is, as to the actual fraud in obtaining the deed from old Jacob Postens. If

[Postens v. Postens.]

that deed of Jacob to William, was obtained by fraud, misrepresentation, and deception, then the defendant cannot avail himself of it, and the plaintiff is entitled to recover.   The facts upon which this point is raised are to be found mainly in the evidence given by the depositions of Sheimer, Van Auken and Westbrook, and in the evidence here given by Van Oys.   On the part of the defendant is the evidence of Judge Stoll, and of Benjamin Hornbeck and Jacob Hornbeck.   It is then for the jury, from all the evidence, to determine whether this deed was procured by improper contrivance, false statements, and fraud, on the part of William Postens.   That no money was paid, nor any other valuable consideration passed from him to his father, is clear, from all the testimony.   Natural love and affection, and a desire on the part of the old gentlemen to advance to the greatest possible extent the interests of his son, were in his mind the moving causes to the execution of the deed.   Should the jury be of the opinion that this deed was not improperly obtained, they will be led to the next inquiry.

2.  Was this a voluntary deed, so as to be void as against prior creditors ?   The defendants contend, " that if this deed were made in consideration of a conveyance, or gift of other property or money by Jacob Hornbeck to his daughter, then it is upon valuable consideration, and not a voluntary deed, even if no other than natural love were the moving cause in the mind of Jacob Postens."

To this the court reply, that a settlement by a father upon his son *after marriage*, as against creditors, if voluntary on his part, does not acquire validity from the fact that the father of his son's wife, in consideration of such settlement, gave a similar amount to his daughter.   So far as Jacob Postens and his creditors are concerned, this deed is not the less to be considered as a voluntary deed in consequence of the agreement of Jacob Hornbeck to give the like amount to William Posten's wife.

This deed, then, is to be taken as a voluntary deed from the father to his son: and, if it tended to hinder, delay, or defeat prior creditors, is void.   Here, then, are raised for the consideration of the jury, what have been treated and discussed as the main and material questions in the case; and they are these :

1.  What was the amount of debts due by Jacob Postens on the 18th December 1828 ?

2.  What was the amount of his property at that time ?

3.  Was his property, exclusive of that conveyed to William, sufficient beyond all doubt for the payment of his debts ?

The debts due, as claimed by plaintiff, are :

1.  The judgment under which the property was sold to plaintiff, $474.57.

2.  A judgment in favour of plaintiff, entered on the 31st January 1829, upon a note dated 2d August 1810, $527.37.

3. A judgment in favour of plaintiff, entered same day, upon a bond dated 27th January 1829, $3311.62.

The validity of the two first judgments appear to be clearly established, and the contest relates mainly to the third. This judgment was confessed to James by his father, upon a settlement of an alleged hiring of James by his father, extending from 1810 to the time of settlement (27th January 1829). A great variety of testimony has been introduced for the purpose of showing that there was no hiring, and that the contract between James and his father was a renting of the property on shares. If this were so, then this judgment could not affect William, for it is only upon the ground that there was a subsisting contract of hiring that there could have been any indebtedness to James prior to 1828. If it had been originally a renting, the parties could not afterwards, by any agreement between themselves, have converted it into a hiring, so as thereby to affect the vested interest of William under his deed.

This part of the case, then, is to depend upon whether, under the evidence, the jury believe the agreement between James and his father were a hiring or renting. If it were a renting, then in 1828 the father could not have had any contract with James, upon settlement of which James could found his judgment; and in that case that judgment could not be taken into account in ascertaining the amount the father owed in 1828. And then, too, there seems little question that he was *beyond all doubt* able to pay his debts, without any recourse to the property conveyed to William.

If the jury, under the evidence, believe the contract to have been a hiring of James, then they will inquire whether, including this judgment, or rather the amount of wages then due James, the property of the father was beyond all doubt sufficient, without including this land, to pay all his debts. The jury should investigate this part of the case with great care and deliberation, as upon the view they take of it the cause will probably be decided.

When this cause was before tried, nearly all the legal questions involved in it were settled. A few points have been submitted for the charge of the court, by the plaintiff, which have been substantially answered in the foregoing part of the charge. So far as it is necessary to reply to them further, the court do so by affirming the positions taken in the points, except the sixth; and that is correct, with this qualification—that if William were a party to the fraud, and the promise of Jacob Hornbeck were the only consideration. But, if Jacob Postens, intending to benefit his son by the conveyance of the land, was induced to seek the arrangement with Hornbeck by his desire to advance his son's interest, the failure of Hornbeck to comply with his part of the contract, whatever may have been the motives which induced such failure, would not avoid the contract.

To this charge both parties excepted.

III. — M

[Postens v. Postens.]

Errors assigned :

1. The court erred in admitting the evidence mentioned in the 1st, 2d, 3d, 4th, 5th, 6th and 7th bills of exceptions.

2. In their answer to the first point proposed by the plaintiff's counsel.

3. In charging the jury that the judgment of James Postens for $3311.62 was evidence of indebtedness to the amount, unless shown to be fraudulent or collusive.

4. In withdrawing from the jury the fact of the validity of the judgment in favour of Stroud's executors, and in charging the jury that the same was clearly established.

*Hepburn* and *Ihrie*, for plaintiff in error. ·
*Maxwell* and *J. M. Porter, contra.*

The opinion of the Court was delivered by

SERGEANT, J.—The first exception is to the permission given by the court to the plaintiff to ask what was the character and standing of three of the persons who assisted in the settlement of the accounts between Jacob Postens and his son James? The objection is, that their characters not having been attacked by the defendant, and the issue not involving any imputation of fraud against them, the evidence was irrelevant and improper. It would seem that these persons were not appointed as referees, to arbitrate the accounts, but were called in rather for their friendly advice and assistance, in the character of neighbours and friends; so that it is not exactly like the case of asking the character of a party to the cause when not in issue, or that of an arbitrator, before it is attacked, which is not permitted, lest it should lead to a prolix inquiry, consuming time needlessly. It does appear, however, that the previous cross-examination by the defendant rather tended to question the mode in which these persons con-·ducted themselves, and the circumstances under which they acted, as well as the fitness of the old man to transact such a business, and involved indirectly a reflection on those who sanctioned the settlement. But it is sufficient that in looking to the answer of the witness it amounts to no more than the law of itself would imply without proof—namely, that their characters stood fair. This being the case, it could have done no prejudice to the defendant, even admitting that it would not otherwise have been strictly proper.

2. The plaintiff could not be permitted to give in evidence the declarations of Jacob Postens subsequent to his deed to William, for the purpose of impugning the title; the rule being settled, that the declarations of the grantor after parting with the title, are not evidence to affect or impeach it in the hands of his grantee. The ground, however, on which the evidence seems to have been admitted, was, that these declarations occurred in a conversation of

[Postens v. Postens.]

which the defendant had already given a portion in evidence, and that the plaintiff had a right to call for the rest of that conversation. And on turning to the latter part of the evidence given by the defendant in the previous deposition of the same witness, such seems to have been the case, for he says, " I was down at the old man's, William Posten's, after the deed was given to transfer the land in question. The old man then complained that William did not come and live on it. He (the old man) said, that William had a deed for it." The evidence in this point of view was admissible.

3. The evidence of the value in the years 1830 and 1831, of a tract of land (not the premises in dispute) which had belonged to Jacob Postens, was objected to, because it was after the time when the deed to William was made. As a mode of ascertaining the value of the grantor's estate at or about the year 1828, it was admissible; particularly as the witness had previously stated he should not think there was much change in the value from 1828 to 1830; and the defendant cross-examined the witness, and might examine others to show, that its value was changed in the mean time.

4. The 4th and 5th bills of exceptions are to the evidence of the declarations of Jacob Postens, as to James Postens's management of the farm, and that he had hired James Postens. These declarations appear to have been made during the time when the relationship between the father and son existed, whether in the capacity of landlord and tenant, or of master and servant, and were part of the *res gestæ*. The relation of the parties being of doubtful interpretation, the character in which they really stood might be proved by the declarations of either made at the time, as to the relations existing between them.

The 6th bill of exceptions is, to the evidence of Stokes, which it is said has no bearing on the case. This may be so, and it is sometimes difficult for a court of error to perceive the application of particular evidence; and, therefore, it will not reverse for a matter of this kind, whether received or rejected, when possibly no prejudice is done to the cause by either course on the part of the court below.

7th. What James Postens said to the witness when he called on him to attend the settlement is objected to. The defendant had, however, proved by this and other witnesses, that James Postens had called on him to attend, and what he said was a part of the transaction, calculated to rebut the allegation that James of his own accord procured the attendance of these persons; and it was properly admitted.

I perceive nothing to warrant the exceptions to the charge of the court, that the validity of the two first judgments, (for $474.57, and $527.37), appeared to be clearly established. They remained in full force, not reversed or set aside, and could not be questioned

[Postens v. Postens.]

in this collateral proceeding, unless collusion or covin were shown between the parties to them, which is not pretended; and as to the indebtedness under them, the latter judgment was entered within 20 years from the date of the bill obligatory; and though the former was after a lapse of more than 20 years, yet the presumption of payment was rebutted by the endorsement of Jacob Postens, promising to pay on the 1st of June 1830. Such promise, it is true, would not revive a sealed instrument as such, which had been barred by a statutory provision, (2 *Rawle* 351); but it would be effectual as a circumstance to rebut the presumption of payment arising from the mere lapse of time, and would leave the bond in its original vigour.

Judgment affirmed.