No. 11,166.

STATE OF LOUISIANA VS. CHARLES C. BUCK AND THE PLAQUEMINES
TROPICAL FRUIT COMPANY.

1. Notwithstanding property in dispute in a petitory action be situated in the parish of Plaquemines, the Civil District Court of the parish of Orleans acquires full and complete jurisdiction *ratione materiæ et personæ* if the parties claiming ownership be *personally* cited therein—same being citizens of another State.

2. An exception to the jurisdiction of the court *ratione personæ* to be availing must be tendered *in limine* and disencumbered by any other issue.

3. No one can acquire title to any part of the public domain by the prescription *acquirendi causa*.

4. A patent for public lands reciting that a named party has purchased all the unsurveyed sea marsh in a certain township and range, west of the Mississippi river, excepting certain surveyed lots situated on the river, containing a certain number of acres, and extending back to a certain named bay, according to the official plat of the survey of said lands, in the State land office, does not evidence a sale *per aversionem*.

5. The title to alluvion is a purely accessory right attaching exclusively to riparian proprietorship and incapable of existing without it.

6. The very object, purpose and scope of Act 104 of 1888 is to authorize the register of the State land office to cancel the entry last made when there are two conflicting patents outstanding to the same identical land. It does not confer upon him authority to hear and determine such a controversy as this.

APPEAL from the Civil District Court for the Parish of Orleans.
*Monroe, J.*

*M. J. Cunningham*, Attorney General, for State, Appellee.

*Henry J. Leovy* of Counsel:

Declinatory exception is a dilatory exception. Code of Practice, 331. Declinatory exception declines " the jurisdiction of the judge before whom it is brought."

*All* dilatory exceptions must be pleaded before *issue joined.* C. P. 33 declares, in referring to dilatory exceptions, "in any case they must be pleaded *in limine litis,* nor shall such exceptions be allowed *in any answer* in any cause."

" All dilatory exceptions are waived by answer." Cross on Pleadings, pp. 123, 162.

" A plea of jurisdiction is waived by one to the merits." Hennen, p. 1162, No. 2.

State vs. Buck and Fruit Co.

An exception to jurisdiction must be pleaded *in limine.* Hennen, 1166, No. 5; 31 An. 88; 39 An. 624.

Defendant can not plead singly different technical objections. After exception to citation he can not plead domicile. 13 An. 409.

All dilatory exceptions must be pleaded before *default.*

" Hereafter no dilatory exceptions shall be allowed in *any case* after judgment by default." C. P. 333.

" The plea of discussion is a dilatory exception, and can not be pleaded after default." 34 An. 96.

"No dilatory exception can be pleaded after default, which is equivalent to issue joined." Hennen, 1163, No. 5; 15 An. 184.

" Plea to jurisdiction is too late after default." 15 An. 184.

The filing of a dilatory exception, or plea to the jurisdiction, *and* an answer to the merits in the same paper, is *a waiver of the dilatory* exception."

Art. 333, C. P., referring to dilatory exceptions, says: " Nor shall such exceptions hereafter be allowed in any answer in any cause."

A dilatory exception can not be pleaded *with* the answer. 34 An. 962, Chaffe vs. Ludeling.

" Dilatory pleas must be tendered and *disposed of in limine,* and can not be legally embodied in the answer." Robbins vs. Martin, 43 An. 488.

"The answer also includes other matters of exception, dilatory and *declinatory* in character, which need no other mention than to say they should have been separately urged and disposed of *before* issue was joined on the merits, and this course not having been pursued, *they were waived.*" *Ibid.*

" Going into the trial without objection on discussion of plea to the jurisdiction is a waiver of the exception."

" Defendant not insisting upon his exception being tried first and passed upon by the court, it must be considered as being waived." 32 An. 1146.

Judgment against defendant rendered out of his domicile is valid if he appears or pleads to the merits. 32 An. 1146; 39 An. 627; 40 An. 493.

Exception is waived by going to trial without insisting on decision on the exception. Cross on Pleadings, p. 124, Sec. 107.

One who proceeds to trial without asking for judgment on his plea to

42

the jurisdiction, waives it.	Hennen, 1165, No. 1; 34 An. 963; 15 An. 188; 24 An. 254; 33 An 438; 34 An. 301.

The authority of a public officer depends on the law as it is when he acts. He has only such power as the law specifically granted. 101 U. S. 698; 131 U. S. 173; 5 An. 516; 44 An. 215. The register of the land office can not sell land for less than the price fixed by statute, nor sell more land than is paid for.

When lands are granted according to an official plat, the plat itself becomes as much a part of the grant or deed, so far as limits are concerned, as if it were written out upon the face of the deed. 128 U. S. 691.

The boundaries and quantity of land granted by a patent must be ascertained by the descriptive language in the patent itself (20 Howard, 372). The number of acres stated in the patent and the price paid fix the quantity of land sold.

Batture or accretion formed at the time of a sale is not included in the sale unless expressly included in the deed. Ferriere vs. City, 35 An. 209; 8 N. S. 572; 11 La. 140. Nor can batture owned by the State be transferred except by sale, at a price fixed by law.

Owners of land are not entitled to accretion formed in the rear of their land. It is only on running streams that batture rights exist. C. C. 504, 509; 34 An. 837; 35 An. 209; 6 N. S. 216; 12 La. 324; 18 La. 122; 143 U. S. 366.

Swamp lands acquired by grant from the United States can not become subject to private ownership, because, by deposit of sediment, they have been elevated above the water.

A sale *per aversionem* only conveys all land between designated boundaries. Where there are defined boundaries there can be no claim *per aversionem* beyond them. C. C. 826, 854, 2494; Hennen's Dig., p. 1339; 16 La. 185.

The act of 1888, p. 169, provides for the issuance of warrants to holders of patents erroneously issued. It gives no right to the holder of valid patents to remove alleged clouds from their titles. The Land Register has no judicial power under said act to settle controversies relating to conflicting claims. The State can not be affected by the acts of officers beyond the power vested in them by law.

Prescription can not be pleaded against the State. Illegal possession of public lands vests no right whatever. 11 M. 210; 9 R. 283;

115 U. S. 413; 6 R. R. 482; 43 An. 225; Hennen's Digest, p. 121, No. 6; Bushnell on Limitations, p. 147.

In suits for *damage actually done* in case of trespass and slander of title, it is not necessary to allege possession in the plaintiff.' Cooley on Torts, p. 332; Abbott's Trial Evidence, p. 635; Boone on Code Pleading, p. 421.

*Gurley & Mellen* Attorneys for Defendants and Appellants:

The courts of the parish of Orleans have no jurisdiction over a petitory action concerning land situated in the parish of Plaquemines. The fact that the defendant is a foreign corporation which has not declared the locality of its domicile, or the name of its agent or officer in the State upon whom service of process can be made, but is carrying on business and has an officer and employés in the parish of Plaquemines, does not enable the courts of the parish of Orleans to acquire jurisdiction by service upon the officer of the corporation when temporarily in the parish of Orleans.    Act 149 of 1890.

The decision of the Register of the Land Office on April 24, 1889, rendered under authority of Act 104 of 1888, in favor of Patent No. 526, and canceling subsequent patents issued for lands within the boundaries designated in Patent No. 526, is conclusive of defendants' right under said patent to all lands within said designated boundaries, and plaintiff is stopped from now questioning said decision.    138 U. S. 573;  93 U. S. 169;  121 U. S. 488; 139 U. S. 163; Abbott's Nat. Digest, Vol. 3, p. 797, title "Public Lands," pars. 16, 27, p. 596; 91 Cal. 158.

The State is not excepted from the effects and operation of the statutes of prescription, when it appears in a court of justice, defendants and those from whom they acquired title have been in possession, in good faith, under a just title translative of property, and exercise the rights of ownership upon and concerning the lands within the limits defined in the Patent 526, for more than twenty years, and this action is barred by prescription.    C. C. 3521, 3478 *et seq.;* 9 An. 137; 23 An. 570; 30 An. 562.

Patent No. 526 is a sale of "all the unsurveyed sea marsh" within fixed boundaries, the lines of township 21 south, ranges 30 and

31 east, in the Southeast Land District of Louisiana, west of the Mississippi river, extending back to West Bay, excepting there from the lots fronting on the river and section 16 in both ranges.

The expression "containing 1320 acres" in said patent is merely an estimate and is controlled by the fixed bounds, and the patent conveys all the land between those bounds, save that specially excepted.

The printed words "according to the official plat of the survey of said lands in the State Land Office" are meaningless. There can be no official plat of the survey of unsurveyed sea marsh. C. C., Arts. 854 and 2495; 29 Ill. 392; 83 N. Y. 518; 95 U. S. 551; 9 Cranch, 173; 3 How. 187; Eng. and Am. Ency. of Law, Vol. 2, pp. 499 and 500; 3 Me. 71; 10 Iowa, 249; 13 Pick. (Mass.) 145; 27 Barb. (N. Y.) 196; 48 Mo. 325; 50 Cal. 439; 21 How. 306; 3 Rob. 188.

The area of land between the defined boundaries, less the exceptions designated, did not exceed 1320 acres at the time of the issue of Patent 526, 30th of September, 1869. It consisted of tongues of land extending back to West Bay, as well as the sea marsh adjoining the lots fronting on the river.

The increase in the area of land within the defined boundaries has taken place since the issuance of Patent 526, and is alluvion, gradually formed solely by the sediment of the Mississippi river, and belongs, by right of accretion, to the land to which it was attached. That land was subject to diminution and gradual loss, and is entitled to the gradual gain. C. C., Art. 599; 10 Peters, 662; 23 Wall. 46; 6 Martin, 216; 10 Rob. 99; Succession of Delachaise vs. Chas. B. Maginnis, No. 10,957, Supreme Court of Louisiana, not yet reported; Eng. and Am. Ency. of Law, Vol. 1, p. 137; Gould on Waters, 2d Edition, pp. 311 and 312, par. 155; Laurent, Principes du Code Civil Français, No. 6, and p. 375.

Latourettes' and Bradford's maps, offered by plaintiff, are shown by the United States Coast Survey Chart of 1884, and the Surveyor General's and United States Land Office certificates, to be incorrect.

Where defendant is cast in an action in which his vendor is called in warranty there must be rendered at the same time a judgment in favor of the defendant against his warraetor. C. P., Art. 385.

*E. Howard McCaleb* Attorney for Warrantor:

Warranty in a contract of sale only takes place in case of eviction. R. C. C., Art. 2500 *et seq.* Where the plaintiff does not seek to evict defendant, but its sole contention is as to the extent, quantity and boundaries of defendant's lands, under its title, defendant's vendor is not liable in warranty.

Where a deed refers to other deeds the description of the latter will by such reference become a part of the former, and has the same effect as if inserted in the subsequent deed. Tiedeman on Real Property, par. 841; 9 Rob. 30.

*Thos. J. Semmes* and *Duane E. Fox* on Application for Rehearing:

The land conveyed by the State was unsurveyed, and therefore the words " according to the official plat of survey " can not properly be held to mean or imply that the land conveyed by said patent was actually surveyed.

We wish particularly to call the attention of this court to the construction by the Supreme Court of the United States of the words " according to the official plat of survey," in a patent issued by the United States, and to the construction of the patent by the court where, as in this case, the survey may not correctly delineate the true line of division between the land conveyed by patent and the adjacent water.

The form of expression " according to the official plat of survey " has been in use in the public land system of the United States from a very early date. It has been borrowed and followed by the various States which acquired lands from the public domain of the United States, and so it is found in the patents issued by the State of Louisiana. The construction of that phrase, therefore, by the Supreme Court of the United States is entitled to the greatest possible weight. Hardin vs. Jordan, 140 U. S. 371; Mitchell vs. Smale, *Id.* 406.

The opinion of the court was delivered by

WATKINS, J. Claiming as owner, certain lands situated in the parish of Plaquemines, on the west side of the Mississippi river,

being the whole of township twenty-one (21) south, ranges thirty (30) and thirty-one (31) east, containing more than thirty thousand acres—same being what is commonly denominated as swamp and over-flowed lands—plaintiff's averment is, that she acquired same, in its entirety, except the front lots which were previously sold off by the United States government, and the sixteenth sections which were dedicated to the public schools, "and also excepting a tract of land between said lots, and what is known as 'West Bay,' as per plan in the State Land Office at Baton Rouge, said excepted tract being one thousand three hundred and twenty acres, which, it is alleged, was sold by the State of Lousiana in September, 1869, by patent No. 526, to C. C. Packard, but which, though not claimed in this suit, peti-tioner does not admit was sold."

Petitioner further alleges that she acquired said lands by grant and donation from the United States government by act of Congress approved September 28, 1850, entitled an act to enable the State of Arkansas and other States to drain the swamp lands within their limits; and other laws on the same subject.

The further allegation is made that Charles C. Buck, of Baltimore, Maryland—but, at the time of filing suit, in New Orleans—and the Plaquemines Tropical Fruit Company, said to have been incorporated under and by virtue of the laws of New Jersey, of which Charles C. Buck is president, have, themselves and through their agents and officers, maliciously and without probable cause denied petitioner's claim of ownership, and have slandered its title thereto, by setting up title in themselves, as derived from Robert M. White, who claims to have acquired same through C. C. Packard, who obtained therefor patent No. 526 from the State of Louisiana in 1869, "whereas said patent, to the knowledge of said defendants, shows no such sale or transfer."

That they are still continuing to slander and maliciously defame petitioner's title to said land, and have recently stated and repre-sented that said company was the owner of same, and that plaintiff possessed no title to any part of it; and that such statements had recently been made to different parties in the city of New Orleans— parties who had applied to the land officers of the government for its purchase.

That upon this allegation of slander of the petitioner's title, claim is made for one thousand eight hundred dollars damages.

Further allegation is made that the defendant, Buck, has been and now is trespassing on said lands, cutting and removing timber therefrom, digging ditches, and otherwise destroying portions of said property and greatly impairing its value, thus causing petitioner great and irreparable injury, making an injunction necessary for the protection of her rights.

Plaintiff's prayer is for citation to and service on each of the two defendants, commanding them to appear and answer her demands in the Civil District Court, in the parish of Orleans; that a writ of injunction issue restraining and prohibiting them from slandering her title, and from trespassing upon her lands, or taking, or keeping any part of same in their possession, "and from interfering in any manner with the possession of the petitioner and (her) full exercise of ownership over (the whole) of said lands;" and that the defendants. be condemned to pay the sum of one thousand eight hundred dollars. as damages for the slander of her title.

The defendant, Buck, excepted *in limine* that plaintiff's petition discloses no cause of action; and, pending trial and final disposition of same, both defendants joined in a further exception to the jurisdiction of the court, *ratione personæ*, because of their domiciles being in New Jersey and Maryland, respectively, and beyond the reach and authority of the same. Both of said exceptions were taken together, tried and overruled.

In their answer the defendants allege that the company is in full and complete possession of the property in controversy, and that the injunction wrongfully issued, reserving the benefit of their exceptions.

Subsequently the plaintiff amended her petition, first reiterating the various charges of her petition, averring the falsity of the defendants' claim of ownership, as derived through Louque, White and Packard, declaring that the alleged false and slanderous statements of the defendants constituted a cloud upon her title, and that she had suffered damages to the extent of two thousand dollars on account of their trespass—claiming judgment for the total sum of three thousand eight hundred dollars. It is concluded by a prayer to the effect that she be recognized as owner of the land described in her original petition and quieted in possession thereof. There being no prayer in said supplemental petition for citation to the defendants, a second supplemental petition was found necessary for that purpose.

.· To these two supplemental petitions the defendants excepted—though subsequent to default being taken—to the effect that the court was without jurisdiction to hear and determine the cause, because the land alleged to have been trespassed upon, and of which plaintiff seeks to· be declared the owner and put in possession, is wholly situated in " parish of Plaquemines, of this State, and neither of defendants reside within the jurisdiction of this Honorable Court, and each one of them has a domicile in the said parish of Plaquemines, and hence (they) specially plead the want of jurisdiction of this Honorable Court."

And subject to said plea, and without waiving the same, the defendants made further answer, and averred " that all of the unsurveyed sea marsh in township 21 south, ranges 30 and 31, lying west of the Mississippi river and Grand Pass in the parish of Plaquemines, except certain lots of small depth fronting on the Mississippi river, and section 16 in ranges 30 and 31 (school sections) was sold and parted with by plaintiff for a valuable consideration, in 1869, to C. C. Packard, and that the right to all accretions passed with said sale"—then follows a delineation of the claim of title as above set forth.

Then follows a circumstantial and detailed account of the circumstances under which the defendant company acquired the ownership of the territory in dispute, and of the care exercised and examinations made, antecedent to making the purchase—alleging that it acted in so doing upon the faith it had in the acts and representations of the land officers of the State government.

They pray that their vendor, Louque, be cited in warranty, and for trial by jury; and, on final trial, for verdict and judgment in favor of the defendant company, decreeing it to be the owner of said lands; or, if there be judgment in favor of the plaintiff, their prayer is for like judgment against their warrantor, Louque, in the alternative.

. Louque appears and answers defendants' call in warranty, and disavows having had any personal interest in the land transaction; and alleges that it was made by him, at the request of the defendants, and that he purchased said property for them, and immediately after taking the title he transferred it to them before the same notary.

.· That he purchased from R. M. White, who is bound to him in warranty, and should protect him in every and all particulars.·

Thereupon he prays that the call in warranty of the defendant company be dismissed as to him, in so far as it may have, in any manner, a tendency to make him responsible; and that, in the alternative that same should be maintained, he have judgment against his vendor, White, whom he calls in warranty.

He also prays that the Mutual National Bank and the Metropolitan Bank be cited, and, after due proceedings, that there be judgment, in the alternative of the plaintiff's recovery, ordering the surrender of certain notes now in their possession that evidence portions of the purchase price of the property, and requiring the same to be canceled, as being null and void.

The warrantor, White, answered in turn and plead a general denial; and, subsequently, the banks appeared and denied liability, and disavowed possession of the notes they were alleged to have.

The defendant company pleads the prescription of five and ten years, *acquirendi causa*, predicated upon its peaceable and undisturbed possession, under title, in good faith, as a muniment of its ownership; and both defendants plead various acts and proceedings of the land officers of the State government as an estoppel against the demands and claims of the State.

On final trial there was a verdict and judgment against the defendants, recognizing the ownership of the State, reserving the rights of the defendants and Louque against White, warrantor, and making the writ of injunction perpetual.

It is from this judgment that the defendants have appealed—it awarding plaintiff no damages, and she having made no answer to the appeal claiming anything on that score, there is nothing for us to decide except the question of title.

Question was made in the lower court and it was renewed on the argument in this court to the effect that the Civil District Court of the parish of Orleans did not have jurisdiction *ratione materiæ et personæ* of the defendants, or of the property in controversy—it having been considered untenable by the judge *a quo*.

After carefully analyzing the pleadings, we have reached the conclusion that the defendant's exception is not well taken.

Considering and treating this as a petitory action from its incipiency—and this view is the one most favorable to the defendants—we are of the opinion that it was correctly instituted in the parish of Orleans, notwithstanding the *res* is situated in the parish of

Plaquemines, the defendant, Buck, having been *personally* served with citation while temporarily abiding in the city of New Orleans, and he being at the time president of the defendant company, and both being citizens of other States than Louisiana.

An action in revendication of real estate may be brought within the jurisdiction where the property is situated, or that where the defendant has his residence, as the plaintiff chooses.   C. P. 163. Hence the defendant has no right to insist upon the suit being brought in the parish of Plaquemines, and no cause of objection that it was not.

The plaintiff had the choice to locate the suit at the defendant's personal domicile.

A further provision of the law is that "when the defendants are foreigners, or have no known place of residence in the State, they may be cited wherever they are found." C. P. 165, No. 5.

Considering the question from the standpoint of the defendant's personal domicile, it is clear that they had no place of domicile or residence in the State that was *known to the plaintiff at the inception of the suit.*

The property in controversy being situated in the State, and the defendant, Buck, being temporarily present in the parish of Orleans, it was competent for the court of that jurisdiction to cite him to appear and answer therein; and he being the president of the defendant company, it could be likewise cited into court.

But if this be considered and treated as a question of doubt, we think it should be resolved against the defendants, because the defendant, Buck, first appeared and excepted that the plaintiff's petition disclosed no cause of action, and thus voluntarily submitted himself to the jurisdiction of the court; and he being at the same time the president of the defendant company, its right of subsequently excepting to the court's jurisdiction is rendered exceedingly doubtful; particularly as the two defendants united in one exception, and it was engrafted upon and tried and decided with the plea of no cause of action.

The well-defined theory of our jurisprudence is, that the exception of want of jurisdiction *ratione personæ* to be availing must be presented *in limine* and *alone*, and altogether disconnected with and disembarrassed by any other averment of fact which indicates the joining of issue.   If any other issue be conjointly tendered with such exception, it must necessarily fail.

In so far as the similar exception that was tendered to the supplemental petition is concerned, we consider it immaterial, for the reason that the plaintiff was not bound to institute the suit in the parish where the property is situated.

The plea of prescription that is urged by the defendants is unavailing. Their claim of title is founded upon the Packard patent, as is clearly shown by their answer, their averment being "that all of the unsurveyed sea marsh in township 21 south, ranges 30 and 31, lying west of the Mississippi river and Grand Pass, in the parish of Plaquemines"—less certain exceptions enumerated—"was sold and parted with by the plaintiff for a valuable consideration, in 1869, to C. C. Packard, and the right to all accretions passed with said sale," etc., and they claim to have derived title through Packard. Therefore the plea of prescription can not confer title *beyond* the calls of the patent, as nothing can conclude the right of the State government other than a *bona fide* and actual sale—though such accretions as may subsequently accrue may possibly attach thereto. No one can acquire title from the State by prescription. It is a condition precedent to the acquisition of title by prescription *acquirendi causa* that the property should have been severed from the public domain and transferred to that of private ownership, at the date such prescription commenced to run.

In Sanchez vs. Gonzales, 11 O. S. 207, we find this proposition broadly stated, thus:

"It is believed that we may safely assume, as a general rule of prescription, that the public domain is not subjected to it by any length of time."

But in that case there was no question of title derived from the State government, but of one derived from the Spanish crown.

In Pepper vs. Dunlap, 9 R. 283, the case of Sanchez was quoted approvingly, the court declaring that they knew "of no law which establishes the *presumption* of a grant of any part of the public lands."

However, some doubt was created by a *dictum* of the court in same case as reported on a subsequent trial (9 An. 137) by the following language of the court, viz.:

"Prescription is one of the modes of acquiring property by the effect of time and under the conditions regulated by law. R. C. C. 3420 (old number).

"There are no other prescriptions than those established by the code.   Art. 3433.

"Prescription runs against all persons, unless they are included in some exception established by law.   *Id.* 3487.   *    *    *

"Under the Spanish law property could be acquired by prescription against the crown.   At least we find no exception in its favor nor any principle which prevents the operation of the laws of prescription.   *    *    *    *    *    *    *

"Under our code we find no express exception in favor of the State."

But in a later case—McCastle vs. Chancy, 28 An. 720—a contrary opinion is expressed, placing titles derived from the State government upon the same basis as those derived from the United States government.   That was a petitory action, plaintiff claiming title from the State of Louisiana under an act of Congress of date May 20, 1826, and demanding that the patent issued by the United States to the defendant be declared null and void, as having been issued in error.   The court accepted the plaintiff's view of the case and decided that the patent issued to the defendant was erroneous, but declined to maintain the latter's plea of prescription, employing the following language, viz.:

"The United States parted with their title when the selection was made by the State of Louisiana, in 1856, and the title remained in the State until it was vested in the plaintiff.   Consequently no title vested in Chancy, the patentee; but we think, *while he could not prescribe against the State, or United States*, he was such a possessor as to require the plaintiff either to reimburse the value of the materials," etc.

The question treated of in Graham vs. Tignor, 23 An. 570, and State vs. White, 23 An. 733, was that appertaining to the prescription *liberandi causa*, as extinguishing an *action* by the State for the recovery of a debt; and the opinion therein expressed by the court does not militate against that announced in McCastle's case.

Those cases were examined and compared in our opinion in Reed vs. Creditors, 39 An. 115, in which we had occasion to express the following views, viz.:

"Prescription proceeds upon the theory that one in whose favor a right once existed has lost recourse for its enforcement judicially, by reason of his own neglect for such a length of time that it would be against equity to permit its assertion.

" Such an equity can not arise in favor of the subject as against the sovereign by reason of the failure of her officers to perform their duties.

" Certainly not, unless the Legislature has so declared in unmistakable terms."

To this proposition we feel disposed to adhere, as we consider it sound as well as conservative, and in keeping with the views entertained by our predecessors in the McCastle case.

Entertaining this view, we must restrict the defendants to the title which is evidenced by the patent of their vendor, and such accretions as may have been added to the land since the date of its issuance.

On the merits, the substantial facts in controversy are these:

(a) In 1869 the State, through the register of its land office, issued to one C. C. Packard a patent certificate to certain lands which are in contest, which contains the following recitals, viz.:

" Whereas C. C. Packard, * * * purchased, per warrant No. 380, N. S. D., dated September 29, 1869, the following described swamp land, subject to tidal overflow, viz.: *All the unsurveyed sea marsh in township 21* S., ranges 30 and 31 E., in the Southeastern Land District of Louisiana, west of the Mississippi river, *excepting lots fronting on the river, and sections* sixteen in both ranges, containing *thirteen hundred and twenty acres* (1320), extending back to West Bay, according to the official plat of the survey of said lands in the State land office;" it being dated 30th of September, 1869.

(We have quoted from the certified copy made by Fremaux, register, on the 6th of January, 1882, as the oldest of the three in evidence and brought up in the original.)

This patent bears the signatures of the governor and the register of the State land office, and it is thus prefaced, viz.:

" The State of Louisiana (seal), Patent No. 526," etc.

(b) An extract from the books of the land office—that is to say, the stub from his warrant book which shows that warrant No. 380— mentioned in the patent—was issued to C. C. Packard on the 29th of September, 1869, and covers the quantity of 1320 acres of "unsurveyed sea marsh back of lots fronting on the river," in township twenty-one (21) south, ranges 30 and 31 east. It also shows that the the amount paid therefor was three hundred and thirty dollars, or twenty-five cents per acre.   This data corresponds with the recitals of the patent, and is contemporaneous in date therewith—the one fully identifying the other in every particular.

*(c)* A certified extract furnished by the register exhibits the *locus in quo,* as it was in 1836, when surveyed by G. F. Connelly—this exhibit having been taken from an approved map on file in his office.

It shows the excepted lots fronting on the river, as well as the area that is covered by the Packard patent, it being thus delineated, viz. :

" Certificate No. 380, N. D. S. Sea marsh. C. C. Packard. Patent No. 526, N. S. D."

Immediately east of the sea marsh thus indicated is the outline of the river, whilst on the west and in the rear of it are written the words " *West Bay.*"

*(d)* A sketch accompanies a certificate from the Surveyor General indicating the original United States surveys as they appear on the map in his office, and they show that township twenty-one (21), ranges thirty (30) and thirty-one (31), are, in greater part, covered by West Bay, which is given the appearance of an arm of the Gulf of Mexico, extending south on an irregular line almost parallel with the course of Southwest Pass.

On the trial the introduction of evidence took a very wide range, and this necessitated elaborate argument and briefs on both sides of the controversy; but, in our opinion, the greater part of it was unnecessary for the determination of this, a purely petitory action, depending, primarily, upon a proper construction of the patent that was issued to the defendant.

We think it evident from a fair consideration of the patent, taken in connection with the official *data* we have referred to, that it does not evidence a sale *per aversionem,* but one by measure or quantity.

It has been determined that in order "to constitute a sale *per aversionem* there must be certain limits, or a distinct object described, as a field enclosed, or an island, because it is presumed the parties have their attention fixed rather on the boundaries than the enumeration of the quantity." 12 M. 428; 7 An. 672.

Again: "That the sale of a body of land as a *section,* which has limits mathematically fixed and established and generally known, is not a sale *per aversionem.*" Phelps vs. Wilson, 16 La. 185.

Again: "A sale in which specific boundaries are given is a sale *per aversionem,* or a sale from one fixed boundary to anoth r, which includes all the ground between the parties mentioned, whether the

measure be correctly stated or not, the calls for a boundary controlling the enumeration of quantity.'' 18 La. 526; 19 La. 422; 1 R. 34; 2 R. 357; 9 R. 30.

Again: '' The sale of a certain number of acres between certain limits ' so as] to include the said number of acres,' is not a sale *per aversionem*, but of the number of acres specified.'' Hoover vs. Richards, 1 R. 34.

To constitute a sale one *per aversionem* the property should be designated by adjoining tracts, or from boundary to boundary. Hall vs. Nevill, 3 An. 326.

In case the *upper* boundary be given with sufficient certainty, yet no *lower* one is mentioned, it is not a sale *per aversionem*. Boyce vs. Cage, 7 An. 672.

Our code declares that '' there can be neither increase or diminution of price on account of disagreement in measure, when the object is designated by the adjoining tenements, and sold from boundary to boundary. R. C. C. 2495.

The sale to the defendant's author was not made by certain, and particularly designated, fixed, natural and well-known boundaries of lands included within the boundaries indicated.

A careful examination of the patent will show that only two boundaries are given, and those only imperfectly, viz.: (1) '' All the unsurveyed sea marsh in township 21 S., ranges 30 and 31 E., * * * west of the Mississippi river, * * * extending back to West Bay,'' etc.—nothing being stated in reference to the north or south boundary. Nor is this all; for there is a further limitation placed upon *both* of the foregoing limits, thus: (1) ''All the unsurveyed sea marsh, etc., * * * west of the Mississippi river, *excepting lots fronting on the river*,'' etc.; and (2) '' extending back to West Bay, *according to the official plat of the survey of said lands in the State Land Office*.'' So it appears that the Mississippi river was not indicated as the eastern boundary, but the surveyed lots fronting on the river were described as intervening between the river and the land conveyed, and *their* dimensions are not given. And it also appears that West Bay, *as it existed at date of patent*, was not mentioned as the western boundary, but the western boundary was described as, in general terms, '' extending back to West Bay, *according to the official plat of the survey of said lands in the State Land Office*.''

It certainly can not be said that the boundaries given were, in any proper sense, *certain* limits, definitely fixed. The patent issued to Packard did not convey all the land between adjoining tenements; and it is of no consequence that reference is had to the township and ranges in which the land is situated, because they are mathematically fixed, established, and well known limits. The sale was made of all the unsurveyed sea marsh in township twenty-one south, with certain exceptions, containing thirteen hundred and twenty (1320) acres; and which, according to the official plat in the land office, extended back to West Bay, *as it once existed.*

This is evidently a sale by measure. Considering the fact that it was a sale, or entry of public land—property of the State of Louisiana—made by a public official, in pursuance of special laws governing their alienation, how could it be a sale *per aversionem?*

But the register sold thirteen hundred and twenty acres of land, at twenty-five cents per acre, and that is the quantity the patent conveyed to Packard, and no more.

Consequently, the claims of defendants must be restricted to the calls of the patent, unless they have been extended or increased by accretion.

Without entering into the elaborate details of the evidence applicable to the question of accretion *vel non*, it will be sufficient to state that it substantially shows that the lands are situated in the parish of Plaquemines, on the west bank of the Mississippi river, about twelve miles above the passes. That anciently the waters of West Bay spread over the greater part of said lands—extending up from the Gulf of Mexico as "an arm of the sea;" but that, within the past half-century, they have been increased in elevation and extended in area, and made comparatively high by sediment that has been periodically deposited thereon by annual swells of the Mississippi river.

That this process of elevation began about the year 1836, when a crevasse occurred in the banks of the river at a fisherman's canal, then known as Gilbert's Canal, but ever since that time known as the "Jump."

That a United States surveyor made a survey of the land fronting on the river in 1836, and divided same into lots, and located the sea marsh, as it then existed, in the rear of said lots, in the direction of West Bay—same not extending back more than thirty (30)

chains (say two thousand feet), at its greatest depth, and averaging not more one thousand feet; that is to say, to the waters of West Bay.

These facts are in keeping with the recitals of the Packard patent, and the maps, plats and profiles of the land office, we have referred to.

In order to furnish a more accurate idea of the *locus* we have made the subjoined extract from one of the briefs of defendants' counsel, quoting from the testimony of E. L. Corthell, a civil engineer of great skill and repute, viz.:

"I have a knowledge of the 'Jump,' a crevasse leading out of the Mississippi river, and of the lands in said 'Jump.' My knowledge is from personal examination and observation made at sundry times, from May, 1875, to July, 1888. During that time, particularly during the first five years of that period, my business as the resident engineer in charge of the construction of the South Pass Jetties and as superintendent during a large part of this time of said works, required my presence in the 'Jump,' where the materials in the shape of willows were obtained for the construction of said works. The land on which the willows grew was formed by deposits of sediment from the Mississippi river. The quantity of the said lands thus formed through this crevasse I can not state. It must have been more than six thousand acres, for this was the amount of land which Capt. James B. Eads, or a company which he represented, surveyed and obtained for the purposes of cutting the willows for the jetties.

"From what I consider reliable information, obtained while engaged in my business above mentioned, and particularly while gathering information for writing the history of the Mississippi Jetties, the formation of the land began in its recent development, about the year 1835, by the river, at an unusual flood, breaking through a small fisherman's canal, pouring its waters through a very large crevasse, estimated to be at that time over one thousand eight hundred feet wide and sixty feet deep, *into the adjacent shallow bay, which at that time approached near to the banks of the river*, and was, in general conditions, very much like other bays still to be seen on either side of the river and its passes, *entirely unobstructed by islands, and presenting a smooth sheet of water. The immense amount of sedimentary deposit carried in by the river, after the crevasse formed, led to an immediate and rapidly growing formation of land.* In May,

43*

1875, this tract of land was threaded in various directions by open channels of sufficient depth and width for a large sternwheel steamboat to navigate, towing barges over one hundred and fifty feet in length. *A main channel, wide and of considerable depth, led from the river to the waters of the gulf, and subsidiary channels led from this main channel in many directions, and they were several miles in length, bordered on each of their banks by growth, mostly of willows.* The land and the channels above mentioned changed considerably during the five years required for building the South Pass Jetties. The entrance channel narrowed and its depth was greatly reduced. The main channel and all of the subsidiary channels above mentioned were considerably reduced in length (width, evidently), so that, where it was possible to navigate with the above mentioned boat and barges in 1875, it was not possible to do so in 1879 and 1880. A great deal of the land above mentioned was, during that time, subject to overflow during the river floods, and a deposition of sediment continued raising them more and more out of the water.

" The lands through which the said Jump and its branches run and the said Jump and its branches themselves have changed very materially within my recollection.

" In the line of my professional work I have had occasion to carefully study the physical conditions of the lower Mississippi river and the result has been that the conditions above described at the Jump prevail elsewhere where the river breaks through the narrow banks which separate it from the waters of the bay on either side. At a point about three miles above the head of the pass, called Cubitt's, Gap, the river similarly broke through. This occurred not long before the jetties were begun in 1875. At that time it was a broad expanse of water in the adjacent bay, without any sign whatever of land appearing above the surface. This crevasse was about a half mile in width and from 60 to 80 feet in depth. The immense amount of sedimentary matter discharged into the shallow bay raised a considerable portion of the submerged land above the water surface before 1880, on which the reeds, grasses and willows began to grow. The delta formation which took place at the Jump took place here. Several channels led in various directions and between them the land rose above the surface.

" In 1888, from my own observation, the land had greatly extended

in area and in height above the surface, and the vegetation upon it had also greatly increased. Following the general law of such crevasses, this process of land-making will continue rapidly until a great area, like that at the Jump, will have been formed. The ultimate and not very distant result of the conditions existing at not only these two places, but at others, is the almost entire closing of the outlet. The principal reason for this closing up of crevasses and outlets is that the river water can not flow to any great distance from the river over the shallow bays, on account of the great frictional resistance which the submerged lands present to the flow of the water. This frictional resistance retards the velocity of the current, and the water, charged or loaded to its full capacity when it enters the crevasse, is not able physically to carry its burden, and drops it upon these submerged lands, and thus rapidly raises them to the surface of the ordinary level of the gulf. There are many points which I have observed in the passes of the Mississippi and along the river near them, where crevasses took place many years ago, but by the process above described have been entirely closed up and nothing is left but a ' scar,' as it were, to show where a cut had been made in the banks of the river at some time long past. It is an accepted axiom among the hydraulic engineers of the Mississippi that ' the river heals its own wounds.' ''

The evidence discloses this witness to have been one of the engineers of Captain James B. Eads, and, as such, gave superintendence to the construction of the jetties in 1875, and subsequent years—a few years after the Packard entry of the land in controversy. It further shows that he subsequently wrote and published a work entitled the History of the Mississippi Jetties, from which the record furnishes several extracts, and we quote the following, viz.:

" About forty-five years ago the river broke through its west bank, twelve miles above the head of the passes, at a narrow fisherman's canal that led up to it from the gulf. In a short time a torrent eighteen hundred feet wide and sixty feet deep swept through this crevasse. For a long time the river at flood poured through it with great velocity, and spread its muddy waters far and wide over the shallow bay. The same principles that produced the delta at the mouth of the river formed one here. After the lapse of years there appeared well-marked channels, three or four feet deeper than the adjoining shoals, which gradually rose to the surface by the deposits.

of successive overflows. These shoals confined the currents still more to the channels, and increased their depth. The seeds of grasses, flags and reeds that came down with the river found a lodgment on the half-submerged banks, and soon covered them with a rank vegetation. This growth caught the sediment carried into it by the overflowing waters and built up the banks still higher, on which sprang up a dense growth of willows, crowding out the weaker vegetation and taking possession of the whole district. A richer and more conveniently arranged harvest field for the jetties than this great tract of willows could not have been found. This crevasse is generally known as the 'Jump.' The passes of the Jump were sufficiently wide and deep to admit a good-sized steamboat, and they ramified this sub-delta in every direction."

Taking the testimony of this witness as our guide, and we think it but fair that we should do so, it appears evident that the alluvial deposits he describes gave greatest elevation to the lands in question during the series of years *immediately succeeding 1836*, the year during which the crevasse occurred, and consequently there must have been a large area of land raised above inundation, as well as tidal overflow, at date patent issued to Packard in 1869— more than thirty years subsequently.

The precise condition of things existing at date of issuing patent, is not clearly ascertainable from the evidence, but it is quite apparent that such elevated area *must have extended much beyond the limits of the tract it conveyed* to Packard, taking the surveyed lots on the river front as the initial point of calculation.

And presumably the register of the land office was aware of the status of the sea marsh in this locality, and issued his warrant of location as well as the patent conformably thereto.

Accepting this as the true situation of the land conveyed by the patent, it is quite manifest that it did not constitute a riparious estate, in the sense of the civil law, to which the described accretions attached.

In the recent and conspicuous case of Delachaise vs. Maginnis, 44 An. 1043, this question passed under critical review and analysis, and this court, through Mr. Justice Fenner, as its organ, said:

" The principle underlying and determining the title to alluvion in our system is the equitable one expressed in the maxim *Qui sentit onus sentire debit et commodum.* As Portalis, in his ' Exposé des

Motifs' of the Code Napoleon, quaintly says: 'There exists, so to speak, an aleatory contract between the riparious owner and nature, whose action may at any moment despoil or increase his estate, in which sense it may be said that rivers give or take away like chance or fortune.' If it takes away, the owner must bear the loss; if it gives, justice accords him the gain.

" Another principle is that the title to alluvion is a purely acces- sory right, *attaching exclusively to riparian proprietorship*, and in- capable of existing without it. This is implied in the very name given to the right as a right of *accession;* and the chapter of the code under which the provisions relative to alluvion are found is headed thus: ' Of the Right of Accession to What Unites or Incor- porates Itself to the *Thing.*' As strongly stated by this court in the leading case on the subject, *riparian ownership* is ' of the *essence* of the right of alluvion; the alluvion is but the *accessory;* the *front* tract is the *principal;* the *former can not exist without the latter.*' " Municipality vs. Cotton Press, 18 La. 219; *vide* Ruch vs. City, 43 An. 275.

But the principle has been incorporated into our code in the fol- lowing words, viz. :

" The accretions which are formed successively and impercepti- bly to any soil situated on the shore of a river or other stream are called alluvion.

" The alluvion belongs to the owner of the soil *situated on the edge of the water*, whether it be a river or stream, and whether the same be navigable or not," etc. R. C. C. 509.

Counsel quotes from the early case of Stephenson vs. Goff, 10 R. 99, as favoring the theory of the defendants, but we do not so con- sider it.

It says: " Where it is shown that the boundary lines of the land claimed by one holding under a confirmation by the United States, *and a survey made by a government surveyor, were run as near as pos- sible to a bar*, the whole of which was subject to be overflowed at high water, and the greater part of it to an annual overflow, so as to include all the high land susceptible of ownership, the proprietor will be entitled to all the alluvion or batture subsequently formed on the site of the bar."

But we are of the opinion that a proper construction of the fore- going quotation confirms our view.

See also Ferriere vs. City, 35 An. 209.

On the law and the evidence our conclusion is clear, to the effect that the defendants are not entitled to the alluvion that has been formed in the rear of the sea marsh their vendor acquired from the State.

During the progress of the trial the defendants set up, as an estoppel against the demands of the State, the proceedings and decision of the register of the land office, in 1889, wherein he recognized the title of the defendants under the Packard patent, and canceled certain entries of other parties of portions thereof, as being in conflict therewith—acting under the authority conferred by the provisions of Act 104 of 1888.

We do not think this a serious plea, because the law referred to has no application to this class of cases.

The act, in terms, confers upon the register authority, under the circumstances and conditions named, to cancel " dual or double entries," which have been made " by conflicting claimants " to the same identical land. But the lawmaker was so cautious as to place a limitation upon the power conferred, and only authorized him to " cancel the last entry made, provided such entry was made through error, mistake or otherwise; and provided further, that the first or former entry is held to be valid." Sec. 1, Act 104 of 1888.

The following is the text of the register's decision, viz. :

"BATON ROUGE, April 24, 1889.

"This matter, having been submitted by *R. M. White*, upon the evidence filed by him, and the defendant, Bayley, having been notified by letter of said White's application *for cancellation of his patents*, and the said letter having been returned in due course of mail *as uncalled for*, and the evidence being in favor of said White's application, under and by virtue of Act No. 104 of 1888, I do hereby *cancel patents* Nos. 2050 and 3072, issued to said G. W. R. Bayley, agent, respectively, on the 27th April, 1875, and 12th day of June, 1875. This 24th day of April, 1889.

JOHN S. LANIER, *Register.*

Now it appears that the defendants trace title to the lands in controversy through the identical *R. M. White*, upon whose application the patents of Bayley, supposed to be in conflict with his own, were canceled. It also appears that the decision was based *solely* and ex-

clusively upon the evidence he filed, and that the contestee was never notified of said proceedings at all. And neither he nor his assignors are parties to this suit.

Such a proceeding was virtually *ex parte* and possesses not a single ingredient of *contestatio litis*, the determination of which forms either *res judicata* or estoppel against the State; and she is not concluded thereby.

After a careful investigation of this case we have reached the deliberate conclusion that the judgment appealed from is correct.

Judgment affirmed.

Mr. Justice Parlange takes no part.

Rehearing refused.